STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. WALTER G. WINNE, DEFENDANT-RESPONDENT.

Argued March 2, 1953—Decided March 30, 1953.

160

*Mr. William A. Consodine* argued the cause for the appellant (*Messrs. Crummy and Consodine*, of counsel; *Mr. John J. Gibbons* on the brief; *Mr. Theodore D. Parsons*, Attorney-General of the State of New Jersey).

*Mr. John W. McGeehan, Jr.,* argued the cause for the respondent (*Mr. Joseph Weintraub*, of counsel).

The opinion of the court was delivered by

VANDERBILT, C. J. The defendant, the County Prosecutor of Bergen County, was indicted on November 28, 1951, on 19 counts charging him with criminal nonfeasance in office. On June 30, 1952 the defendant moved to dismiss the indictment. The trial court made an order on August 18, 1952 granting the motion, which the State seeks to review here.

The first 16 counts follow a single pattern. They identify the defendant as the county prosecutor. They allege that he was charged with the public duty of using all proper, reasonable, effective and lawful means within his power and diligence for the detection, arrest, indictment and conviction of offenders against the law in accordance with *R. S.* 2:182–5. Specifically, they set forth his duty to suppress all disorderly houses wherein gambling is conducted in the county. They charge that he had sufficient assistance and power to enforce the public duties enjoined on him by law. Then each of the 16 indictments gives a specific place where and the times when gambling was carried on. Each of these indictments concludes by charging not only that the defendant knew of these unlawful activities but that he "unlawfully and wilfully did neglect and omit to perform the said public duties so enjoined upon him and then and there continuously, unlawfully and wilfully did neglect, fail and omit to use and exercise, and cause to be used and exercised, all proper, reasonable, effective and diligent means within his power as Prosecutor of Bergen County, for the detection, arrest, indictment and conviction of a person or persons who kept

and maintained the gambling house as aforesaid, wherein the practice of maintaining a resort to which persons might come for an illegal purpose, namely, for the purpose of playing at dice."

Each of the last three counts of the indictment differs from the first 16 counts only in that, instead of charging gambling at a designated place and times, it asserts that the defendant had received a complaint charging that a member of the Rutherford Police Department (a different person being named in each count) was a corrupt public official, and that the defendant "wilfully did neglect and omit to perform the said public duties so enjoined upon him; and then and there continuously, unlawfully and wilfully did neglect, fail and omit to use and exercise, and cause to be used and exercised, all proper, reasonable, effective and diligent means and all lawful means within his power as Prosecutor of Bergen County for the detection, arrest, indictment and conviction" of each of the officers named.

Among the distinct crimes for which a public official may be indicted at common law are nonfeasance, misfeasance and malfeasance in public office, 1 Burdick, *Law of Crime* (1946), *sec.* 272. The distinction between these three separate crimes relates to a familiar classification that not only runs through the law of crime but the law of torts as well. Each of these three crimes has its own distinctive elements, and one is not to be confused with either of the others. The crimes of misfeasance and of malfeasance are mentioned here, not because they are involved in the law, but because in this argument both here and in the trial court decisions dealing with misfeasance and malfeasance in public office were relied upon as if they had a bearing on nonfeasance. Such a course of reasoning about different crimes with diverse ingredients as if they were one and the same inevitably tends to confusion of thought and consequently to error in law.

Misfeasance and malfeasance are not alleged in the indictment. There is no charge of doing something wrongfully or corruptly. On the contrary, the gist of the charge here is failure to act. The basic question before us is whether

nonfeasance in public office is properly alleged in the indictments under our practice.

## I.

In judging the sufficiency of the indictments we must consider the official duties of the defendant. As we said in *State v. Weleck*, 10 *N. J.* 355, 366 (1952) :

"The prescribed duties of an office are nothing more nor less than the duties cast by law on the incumbent of the office. Duties may be imposed by law on the holder of an office in several ways: (1) they may be prescribed by some special or private law, such as official action of a township committee, *State v. Hageman*, 13 *N. J. L.* 314, 321 (*Sup. Ct.* 1833), or a provision of a municipal charter, *State v. Startup, supra*, 39 *N. J. L.* 423, 425 (*Sup. Ct.* 1877) ; (2) they may be imposed by a general act of the Legislature as in *State v. McGovern*, 136 *N. J. L.* 115, 117 (*Sup. Ct.* 1947), and *State v. O'Brien*, 136 *N. J. L.* 118, 127 (*Sup. Ct.* 1947) ; or (3) they may arise out of the very nature of the office itself, see *State v. Ellenstein*, 121 *N. J. L.* 304, 317–318 (*Sup. Ct.* 1938) ; *State v. Donovan*, 132 *N. J. L.* 319, 321 (*Sup. Ct.* 1945) ; *State v. McFeeley, supra*, 136 *N. J. L.* 102, 107–108 (*Sup. Ct.* 1947) ; and *State v. Lombardo*, 18 *N. J. Super.* 511, 520 (*Cty. Ct.* 1952)."

An attempt is made to identify the powers and duties of the county prosecutor with those of the Attorney-General and then to identify the powers and duties of our Attorney-General with those of the Attorney-General of England. History belies this contention. The Attorney-General of New Jersey could never have exercised the wide powers of the Attorney-General of England in the face of *Article* III of the *Constitutions of* 1844 *and of* 1947, distributing the powers of the government "among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."

Even under the Constitution of 1776, the powers and duties of the Attorney-General of New Jersey were quite different from those of the Attorney-General of England. Especially is it to be noted that in England the prosecution

of crime was traditionally a private matter. It was not until 1879 that the Office of Director of Public Prosecutors was established by the Prosecution of Offenses Act, 42 and 43 *Vict., c.* 22 (5 *Halsbury's Statutes of England* (*2d ed.*), 895). Even now under this act and its amendments, 47 and 48 *Vict., c.* 58, and 8 *Edw.* 7, *c.* 3 (5 *Halsbury* (*2d ed.*), 904, 940), the English prosecutor need act only in offenses punishable by death, offenses against the coinage, fraudulent bankruptcies and violations of the election laws, Howard, *Criminal Justice in England* (1931), 98; Jackson, *The Machinery of Justice in England* (1940), 111. Here, however, public prosecutors superseded private prosecutors long before the Revolution. As early as 1686 we find a record of the colonial Attorney-General appearing for the king in West New Jersey, *The Burlington Court Book* (*Reed and Miller Ed.* 1944), 56. In East New Jersey "the King's Attorney-General prosecuted culprits from minor offenders to murderers," *Journal of the Courts of Common Right and Chancery of East New Jersey,* 1683–1702 (*Edsall Ed.* 1937), 3 and *passim.* In 1703 the Attorney-General was punished for nonfeasance for his failure to prosecute, 1 *Keasby, Courts and Lawyers of New Jersey* (1912), 377. In 1812 the Attorney-General was authorized by statute "to appoint deputies to prosecute the pleas of the state in such counties as he may not be able to attend in person." *Laws of* 1812 *Pam.,* 23; *Pennington's Laws* 1703–1820. In 1822 we find the first mention by name of a prosecutor in each county, *L.* 1822, *p.* 25. This act is the precursor of the first clause of *R. S.* 2:182–5 on which the defendant relies heavily:

"Each prosecutor of the pleas shall be vested with the same powers and subject to the same penalties, within his county, as the attorney general shall by law be vested with or subject to. \* \* \*"

It is important to observe, however, that the numerous civil duties of the Attorney-General have not been assigned to the county prosecutor in each county. His duties are largely, if not exclusively, on the criminal side. It is significant to

note, moreover, the exclusive grant of his power to him on the criminal side:

"The criminal business of the state shall be prosecuted exclusively by the prosecutors of the pleas, except in counties where, for the time being, there may be no prosecutor, or where the prosecutor desires the aid of the attorney general or as otherwise provided by law." *R. S.* 2:182-4.

See *State v. Longo,* 136 *N. J. L.* 589, 592 (*E. & A.* 1947). In 1898 the second clause of *R. S.* 2:182-5, which we deem controlling was enacted:

"* * * and he shall use *all reasonable and lawful diligence* for the *detection, arrest, indictment and conviction* of offenders against the laws." *L.* 1898, *cc.* 237, 238, *pp.* 866-941. (Emphasis added.)

This statute has remained on the books for 55 years without challenge as to its meaning. There are no cases in New Jersey construing it. This clause clearly represents the legislative response to the problems of law enforcement that were reflected in the rapidly increasing population of the State, in the complexities of life in many urban communities and in the need for the concentration of authority in the county for the detection, arrest, indictment and conviction of criminals. Significantly, the county prosecutor of Bergen County is allowed a staff of nine county detectives, *N. J. S. A.* 2:181-35. They are appointed:

"to assist the prosecutor in the *detection, apprehension, arrest and conviction of offenders* against the law." *N. J. S. A.* 2:181-33. (Emphasis added.)

He also has six county investigators serving at his pleasure and removable by him to

"assist the prosecutor in the *detection, apprehension, arrest and conviction of offenders* against the law." *N. J. S. A.* 2:181-41. (Emphasis added.)

In enacting *L.* 1951, *c.* 274, relating, as above set forth, to county detectives and county investigators, the Legislature

was careful not to curtail the prosecutor's power to incur expenses in and about his statutory duties:

"Nothing in this act shall be construed to limit the power of any county prosecutor or prosecutor of the pleas, duly conferred upon him by law, to incur expenses in the *detection, arrest, indictment and conviction* of offenders against the criminal laws of this State." *N. J. S. A.* 2:181-50. (Emphasis added.)

The statutes reflect not a sporadic intent but a fixed legislative policy to cast on the county prosecutor responsibility for the detection, apprehension, arrest and conviction of criminals in his county. Nor has the Legislature merely imposed duties of vast importance to the public on the county prosecutor. Not only has it seen to it that his office is staffed with assistant prosecutors, county detectives and county investigators. It has given him power not paralleled elsewhere in the county to incur expenses in "the detection, arrest, indictment and conviction of offenders" against the law:

"All necessary expenses incurred by the prosecutor of pleas for each county in the *detection, arrest, indictment and conviction* of offenders against the laws shall, upon being certified to and approved, under his hand, by a judge of the court of oyer and terminer or a judge of the court of quarter sessions for such county, be paid by the board of chosen freeholders thereof, whenever the same shall be approved by such board. The amount or amounts to be expended shall not exceed the amount fixed by the board of chosen freeholders in its regular or emergency appropriation, unless such expenditure is specifically authorized by order of the supreme court justice presiding in such county." *R. S.* 2:182-7. (Emphasis added.)

There is no case in the reports of which we are aware where a justice of the former Supreme Court or an assignment judge has failed to approve the expenses of a county prosecutor in the detection, arrest, indictment and conviction of offenders. Clearly the Legislature intended to give him dominant position and the primary responsibility for the enforcement of the criminal laws, not merely by conferring authority on him but by giving him the means of implementing such authority. In contrast, the sheriff, although he

possesses by the common law broad powers of law enforcement in his county, is not given the right to incur expenses in the prosecution of criminals that has been granted to the county prosecutor. The inevitable result of this is that his work as a law enforcement officer has been rendered less effective than that of the county prosecutor, without, however, any diminution of his powers or responsibilities.

Nor is it an answer to the State's position to say that other statutes also cast some of these responsibilities on other public officers such as the local elective officers and the local police. As we said in *State v. Weleck*, 10 *N. J.* 355, 368 (1952), *supra*:

"There is no requirement that the duties of various public officers be mutually exclusive, but rather it is a well recognized fact that certain basic duties are of necessity common to a wide variety of officers. Thus in *State v. Donovan*, *supra*, 132 *N. J. L.* 319 (*Sup. Ct.* 1945), the court considered that the mayor and other public officials of the City of Bayonne had a common responsibility for the enforcement of the criminal law."

The meaning of the Act of 1898 imposing on the county prosecutor duties in the detection, arrest, indictment and conviction of offenders against the law and the numerous statutes implementing the act cannot be restricted, as the defendant would have us construe it, to the prosecution of matters where complaints have already been filed. The meaning of the quoted words is clear and unmistakable in intent. Obviously they do not mean that the county prosecutor is required personally to detect, arrest, indict and convict, though he may and often does do so. They do mean, however, that he is responsible for seeing that those things are done either by himself or his staff or by the local law enforcement authorities functioning within his county. It is a matter of common knowledge that the local law enforcement authorities from the chanceman on his beat to the chief of police and beyond him to the director of public safety are responsive to the county prosecutor's concept of law enforcement on pain of possible indictment if they do not cooperate with him in enforcing the law. He does not stand alone.

He is in a position to command the cooperation of all the law enforcing authorities in the county. He is amply equipped for the performance of his indispensable task, if law and order are to be maintained in the county and all our rights both of person and of property are to be adequately safeguarded.

██ It is urged that the statutory obligations imposed on county prosecutors are so onerous that the Legislature could not have intended the policy set forth so clearly and carried forward in successive enactments for 55 years. A wide variety of fancied terrors for county prosecutors are conjured up, if the statute is construed to mean what it plainly says. Any such view can arise only from failing to read the cited clause in the statute as a whole. We have already called attention to the fact that the county prosecutor does not stand alone; others have corresponding responsibilities and he is in a position to enforce their responsibilities in aid of the performance of his own. It is equally apparent that his official responsibility is not an absolute one and that the impossible is not expected of him by the Legislature. The statute merely enjoins him to *"use all reasonable and lawful diligence."* These are the standards of ordinary life that are being enforced in the courts daily in a wide variety of human relationships. They are likewise the tests imposed by the common law:

"Neglect of Official Duty. Every public officer commits a misdemeanor who wilfully neglects to perform any duty which he is bound either by common law or by statute to perform provided that the discharge of such duty is not attended with greater danger than a man of ordinary firmness and activity may be expected to encounter." Stephen, *Digest of the Criminal Law* (*8th ed.* 1947) *art.* 145.

██ The indictment clearly sets forth breaches of official duty by the defendant in his failure to act with respect to matters concerning which he is expressly charged to do so by statute. Though some of the statutes from which the defendant's duties spring are pleaded, they need not be:

"In those instances where the duties are prescribed by some special or private law, the indictment must show the source of the duties, but where the duties are imposed by a general statute or arise out of the very nature of the office, the source of the duty need not be alleged in the indictment for the courts will take judicial notice of such duties, *State v. Hageman, supra,* 13 *N. J. L.* 314, 320 (*Sup. Ct.* 1833); *State v. Haddonfield & Camden Turnpike Co.,* 65 *N. J. L.* 97, 98 (*Sup. Ct.* 1900); *State v. Middlesex and Somerset Traction Co.,* 67 *N. J. L.* 14, 15 (*Sup. Ct.* 1901); *State v. McFeeley, supra,* 136 *N. J. L.* 102, 107–108 (*Sup. Ct.* 1947); *State v. O'Brien, supra,* 136 *N. J. L.* 118, 126–127 (*Sup. Ct.* 1947)." *State v. Weleck,* 10 *N. J.* 355, 366 (1952) *supra.*

There is no flaw in the indictment on this ground.

## II.

 Regardless of the statutory duties hereinbefore set forth with respect to the detection, arrest, indictment and conviction of criminals, and regardless of whether or not he had used all reasonable and lawful diligence, the defendant insists that no amount of inaction and neglect as to any or all of his duties, whether proscribed by statute or by the common law, will render him liable to indictment for official misconduct, for the reason that the defendant is a *quasi*-judicial officer immune, it is claimed, from criminal attack unless corruption on his part is charged in the indictment and proved at the trial. It is to be noted that in some jurisdictions a county prosecutor is not subject to a civil suit for damages at the hands of an aggrieved citizen, *Yaselli v. Goff,* 12 *F. 2d* 396 (2 *Cir.,* 1926), 56 *A. L. R.* 1239, affirmed 275 *U. S.* 503, 48 *S. Ct.* 155, 72 *L. Ed.* 395 (1927), *Copeland v. Donovan,* 124 *Misc.* 553, 208 *N. Y. S.* 765 (*Cty. Ct.* 1925), 27 *C. J. S.* 409, though that point has not been passed on here. If the defendant's position is sound, then the public and individual citizens alike are without redress in the courts against a county prosecutor who declines to act with respect to any phase of his statutory or common law duties, unless it is alleged and proved that he does so corruptly. If the law were as the defendant contends, an honest but negligent prosecutor would have it within his power to

cripple or nullify the enforcement of the criminal law in his county or to choose at his pleasure the portion of the criminal law he would enforce. He would have, in his county, the suspending power sought so strenuously by the Stuart kings, 2 *Holdsworth, History of English Law* (3rd ed. 1923), 440, 4 *Idem* (1924), 205, 6 *Idem* 192, 204, 217–225, 241–2, and *Maitland, The Constitutional Law of England,* 188, 302–306, but denied to them in the English Bill of Rights: "The pretended power of suspending of laws, or the execution of laws, without consent of Parliament, is illegal," 1 *Wm. & M. sess. 2, c. 2, sec. ii.* There is no difference in principle and there would be no difference in effect except as to territorial range between a Stuart openly defying and preventing the execution of the law and a county prosecutor winking at and tolerating the violation of the laws. Each is utterly inconsistent with the range of law that is the ideal and goal of the common law and equality before the law which is a fundamental tenet of American polity. In his county, as we have seen, the prosecutor is the foremost representative of the executive branch of government in the enforcement of the criminal law. As epitomized in *State ex rel. Johnston v. Foster,* 32 *Kan.* 14, 3 *P.* 534 (*Sup. Ct.* 1884):

"He is the officer upon whom the state relies for the prosecution of all criminal offenses within his jurisdiction. If he fails or refuses to act, the law is voiceless and powerless. It is paralyzed."

From such a fate, as we have seen, the statutory scheme of law enforcement in each county seeks to protect each community and every citizen, and, fortunately for the general welfare, there is no rule or principle of the common law that frustrates or imperils the statutory intent.

It is further asserted that removal from office by the slow and cumbersome process of constitutional impeachment, *Constitution of* 1947, *Art.* VII, *Sec.* III, *pars.* 1–3, or suspension by statutory authority, when an assignment judge requests the Attorney-General either personally or by a deputy to attend in any county "for the purpose of prosecuting the criminal business of the state therein," *R. S.*

2:182–12, or where an assignment judge or the board of chosen freeholders or the prosecutor himself so requests under *N. J. S. A.* 52:17A–5, are the sole remedies available to the State for any misconduct of a county prosecutor. There is no basis in law, however, for holding that these alternative constitutional and administrative remedies replace the sanctions of the criminal law, nor has any authority for such a novel proposition been cited to us. *State v. Jefferson*, 90 *N. J. L.* 507 (*E. & A.* 1907) expressly disposes of the question of the priority of impeachment proceedings over criminal prosecutions. The two statutes above referred to do not contemplate the removal of the county prosecutor, but merely his suspension. Indeed, under *R. S.* 2:182–12 his salary is not suspended for the first three months that the Attorney-General takes over his duties, and the balance of his salary is payable at the termination of the attendance of the Attorney-General. *N. J. S. A.* 52:17A–5 is even more favorable to the county prosecutor in providing "that no compensation so allowed [to the Attorney-General] shall affect the salary of the prosecutor or assistant prosecutors." In passing it is significant to note that each of these statutes, in authorizing the Attorney-General or his representative, in the circumstances mentioned, to take over the work of the county prosecutor expressly includes *"the investigation of alleged crimes and misdemeanors."*

 Obviously many of the duties of a county prosecutor involve the exercise of discretion. His discretion, however, is not unregulated or absolute for the statute expressly commands that he *"shall use all reasonable and lawful diligence* for the detection, arrest, indictment and conviction of offenders against the laws." The kind of discretion that he must exercise is admirably stated in *State ex rel. McKittrick v. Wallach*, 353 *Mo.* 312, 182 *S. W. 2d* 313 (*Sup. Ct.* 1944):

"The duty of a prosecuting officer necessarily requires that he investigate, *i. e.*, inquire into the matter with care and accuracy, that in each case he examine the available evidence, the law and the facts, and the applicability of each to the other; that his duties further require that he intelligently weigh the chances of success-

ful termination of the prosecution, having always in mind the relative importance to the county he serves of the different prosecutions which he might initiate. Such duties of necessity involve a good faith exercise of the sound discretion of the prosecuting attorney. 'Discretion' in that sense means power or right conferred by law upon the prosecuting officer of acting officially in such circumstances, and upon each separate case, according to the dictates of his own judgment and conscience uncontrolled by the judgment and conscience of any other person. Such discretion must be exercised in accordance with established principles of law, fairly, wisely, and with skill and reason. It includes the right to choose a course of action or non-action, chosen not willfully or in bad faith, but chosen with regard to what is right under the circumstances. * * * Such discretion exercised in good faith authorizes the prosecuting officer to personally determine, in conference and in collaboration with peace officers and liquor enforcement officers, that a certain plan of action or a certain policy of enforcement will be best productive of law enforcement, and will best result in general law observance. That there were such conferences, and repeated contacts and collaboration between respondent and such governmental agencies in the case at bar, is a circumstance shedding light upon whether the prosecuting attorney's action or non-action in a case or cases was an arbitrary exercise of discretion or a good faith exercise of discretion."

In distinguishing the case there under consideration from other cases in Missouri in which prosecutors had been tried for nonfeasance the court continues:

"However, the facts in those cases are far different from the situation in this case. In the *Wymore* case [*State ex inf. McKittrick v. Wymore*, 345 *Mo.* 169, 132 *S. W.* 2d 979 (*Sup. Ct.* 1939)] there was a complete failure of the prosecuting attorney to ever commence any prosecution for violation of gambling laws, even after having full information about conditions. This court found that 'he made no effort whatsoever to perform his duties as prosecuting attorney' [345 *Mo.* 169, 132 *S. W.* 2d 986]; and that he 'never reached the point where he even pretended to exercise discretion,' but instead was 'under the influence of evil men.' Obviously that is not the situation here. Both the *Graves* [*State ex inf. McKittrick v. Graves*, 346 *Mo.* 990, 144 *S. W.* 2d 91] and *Williams* [*State ex. inf. McKittrick v. Williams*, 346 *Mo.* 1003, 144 *S. W.* 2d 98 (*Sup. Ct.* 1940)] cases involved continuous long existing conditions of flagrant, open and notorious gambling, prostitution and illegal sale of intoxicating liquor frequently pointed out by the press. The officers involved made no efforts to enforce these laws (and there were also many admitted violations of election laws in the *Graves* case) and claimed that they should be excused for not doing so be-

cause the Kansas City police did not attempt any enforcement. That likewise is clearly not the situation here."

The tests thus laid down afford adequate protection to both the public and the county prosecutor in determining what is all reasonable and lawful diligence under the statute. They set forth the standards developed at common law and they accord with the requirements of our statute. It is interesting to observe that the kind of discretion required of the county prosecutor is not different from that required of a judge:

"It is settled that the exercise of discretion implies conscientious judgment, not arbitrary action, and takes account of the law and particular circumstances of the case, being directed by the reason and conscience of the judge to a just result." *State v. Shiren*, 9 *N. J.* 445, 452 (1952).

A county prosecutor has an obligation to detect and arrest, as well as to obtain indictments and prosecute them. He is under a statutory duty to investigate suspicious situations and determine the facts in the process of detecting and arresting, especially when he receives information that makes it reasonably probable that the law has been violated. There are undoubtedly many instances when a refusal in good faith to prosecute after due investigation would lack the element of "wilfulness," but where he willfully refuses to act, *i. e.,* without just cause or excuse, he is guilty of a breach of duty rendering him liable to indictment. The distinction between the exercise of discretion in good faith and a willful failure to act is to be judged by his conduct in the light of all the facts and circumstances. A county prosecutor within the orbit of his discretion inevitably has various choices of action and even of inaction. This discretion applies as much to the seeking of indictments from the grand jury as it does to prosecuting or recommending a *nolle prosequi* after the indictment has been found, but he must at all times act in good faith and exercise all reasonable and lawful diligence in every phase of his work.

The use in the indictment of the phrase "unlawfully and wilfully" negatives the exercise by the defendant of good faith. In legal effect it charges him with bad faith in his failure to perform the duties of his office. According to the indictment the defendant received reliable information of 19 cases in which the laws of New Jersey were being habitually violated. According to the indictment he did nothing; he completely failed and neglected to investigate either personally or through his own staff of county detectives and county investigators, or to call on the local police to take action. The grand jury charged in each instance the defendant's failure to act was the result of unlawfulness and willfulness. Clearly such an allegation is sufficient to support an indictment.

Not only is the discretion of the defendant not absolute, but it is not necessary to charge corruption in an indictment against him. The defendant, drawing on decisions dealing with malfeasance in office, insists that corruption is an essential ingredient of the indictment, and that the failure of the indictment to charge corruption renders it fatally defective. This might be true if the indictment were for malfeasance, for malfeasance implies corruption. The indictment here, however, is not for malfeasance but for nonfeasance, and corruption has never been an element of nonfeasance. If it were, it would become identical with malfeasance. The furthest the authorities go in any form of official misconduct is to require an allegation in the indictment of either willfulness or corruption, depending on whether the charge is nonfeasance, misfeasance or malfeasance:

"One in office is indictable at the common law, confirmed by statutes in most of our states, if he wilfully or corruptly neglects or declines any official duty, equally whether prescribed by the written law or by the unwritten." 1 Bishop, *Criminal Law*, (*8th ed.* 1892), *sec.* 468 *al.*

See also *Ex Parte Amos*, 93 *Fla.* 5, 112 *So.* 289 (*Sup. Ct.* 1927), where it was said:

"The common-law offense, however, must be charged as having been willfully or corruptly done or omitted. In the absence of such allegation the indictment in this case merely charges the comptroller with an error of judgment in a matter where the complicated and intricate details of a banking business may have misled him to unwise nonaction, but there is no charge of willful or corrupt nonaction upon his part."

 Other authorities maintain that, in the absence of statute, neither willfulness nor corruption need be alleged:

"Misconduct in office, or 'official misconduct,' means, therefore, any unlawful behavior in relation to official duties by an officer intrusted in any way with the administration of law and justice, or, as otherwise defined, any act or omission in breach of a duty of public concern, by one who has accepted public office. The term is broad enough to include malfeasance, misfeasance, and nonfeasance. Under some statutes, it is necessary that the misconduct should be 'wilful' or 'wilful and corrupt,' or 'wilful and malicious,' but, in the absence of such provisions, corruption or criminal intention is not essential. The official doing of a wrongful act, or official neglect to do an act which ought to be done, is sufficient." 1 *Burdick, Law of Crime,* 388.

That is the view prevailing in this State. In *State v. Jefferson,* 88 *N. J. L.* 447, 449 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 507 (*E. & A.* 1916), the Prosecutor of the Pleas of Cape May County was convicted of malfeasance in office, in taking money not to prosecute gamblers. It was claimed on error to the former Supreme Court that the charge was one compounding a misdemeanor. Mr. Justice Garrison, one of our ablest judges, not only disposed of this fallacious argument but stated the law of this State with respect to official misconduct:

"The detailed testimony as to these transactions afforded ample ground for the jury to find that the failure to prosecute was the result of a corrupt agreement in the sense in which that question was left to the jury. Such an agreement was not, however, of the essence of the offense of malfeasance as it would have been of the crime of compounding. Indeed, such an agreement, or even such payments or receipts of money were not essential to the offense of malfeasance, which, without doubt, might be as fully committed for reasons of personal favoritism or for political reasons or for no known reason at all."

He then proceeded to demonstrate why the State in the instant case should not have pleaded and thereby undertaken to prove corruption:

"Still, the pecuniary motive having been set forth in the indictment and tried out before the jury, the court not improperly placed upon the state the burden of proving what it had alleged, and this it did by showing that such a relationship between the receipt of the money and the failure to prosecute was a rational and legitimate inference from the facts in evidence, even though an express agreement in so many words was not shown, the transaction in its nature being one to which the trite saying that 'actions speak louder than words' was eminently applicable."

though as to this point we are here reserving decision as the issue is not presented to us.

On appeal to the Court of Errors and Appeals, the court dealt only with the question of the alleged priority of impeachment proceedings over a criminal prosecution of a constitutional officer. Chief Justice Gummere, speaking for the entire court said:

"Numerous assignments of error were submitted to the Supreme Court, and received consideration by that tribunal in the opinion promulgated by it. The same grounds of attack upon the conviction which were there made have been repeated before us. With a single exception, we are content with the disposition made of them by that court and for the reasons set out in the opinion."

The indictment is not defective in failing to allege corruption.

### III.

It is the defendant's contention that each count of the indictment is fatally deficient in its failure to state facts setting forth his alleged neglect and omission of duty. Our State Constitution guarantees that "No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury.," *Art.* I, *par.* 8. Our rules of court provide that "The indictment or accusation shall be a written statement of the essential facts constituting

the offense charged." *Rule* 2:4–11(*a*). The purpose of the indictment is to inform the accused of the nature of the offense charged so as to enable him to make an adequate defense as well as to avail himself of his conviction or acquittal to avoid the threat of double jeopardy, *State v. Morano*, 134 *N. J. L.* 295 (*E. & A.* 1946). The indictment also serves to inform the court of the facts alleged so that it may decide whether they are sufficient in law to support a conviction if one should be obtained, *U. S. v. Hess*, 124 *U. S.* 483, 31 *L. Ed.* 516 (1888). The indictment must be examined in the light of the constitutional provisions, the rules of court and the decisions.

 Paragraph 3 of each of the first 16 counts set forth defendant's duty as prosecutor to be

"the public duty of using and exercising and causing to be used and exercised, all proper, reasonable and effective means and all lawful means within his power for preserving the public peace and insuring good order in the said County of Bergen, and for suppressing all disorderly houses wherein gaming [etc.] * * *."

Paragraph 5 of each of the first 16 counts charges a breach of duty

"then and there continuously, unlawfully and wilfully did neglect and omit to perform the said public duties so enjoined upon him and then and there continuously, unlawfully and wilfully did neglect, fail and omit to use and exercise, and cause to be used and exercised, all proper reasonable, effective and diligent means within his power as Prosecutor of Bergen County, for the detection, arrest, indictment and conviction of a person or persons who kept and maintained the gaming house as aforesaid * * * but, on the contrary, then and there unlawfully did suffer and permit gambling in the manner and form aforesaid, to wit, that he, the said Walter G. Winne, continuously, unlawfully and wilfully did neglect and omit to perform the said public duties so enjoined upon him by using and exercising all proper, reasonable and effective means and all lawful means within his power, and diligence for the detection, arrest, indictment and conviction of offenders against the law * * *."

Counts 17, 18 and 19 contain substantially the same language as to the duty.

Each of the first 16 counts alleges the existence of a particular disorderly house at a specific street number. The type of gambling is set forth together with the dates when the gambling operation took place. Each count charges that the defendant knew of the existence of the gambling activities. It is difficult to see how the indictment could be more informative on these matters without pleading evidence.

The defendant argues that each count alleges merely naked conclusions of a vague and broad duty to use "all proper, reasonable and effective means and all lawful means" to suppress a particular gambling house, as well as a vague and indefinite breach of duty in that the defendant "unlawfully and willfully did neglect and omit to perform the said public duties" and "did neglect, fail and omit to use and exercise" all proper, reasonable, effective and diligent means for "the detection, arrest, indictment and conviction" of those maintaining each such house. We have said that where the duty arose from some special or private law the indictment must reveal the source, but where the duty was imposed by a general statute or by the nature of the office it was unnecessary to set forth the source since the court will take judicial notice of the duties. *State v. Weleck, supra.* Each count uses the language of *R. S.* 2 :182–5, *supra,* in charging defendant with the duty of "detection, arrest, indictment and conviction" of violators of the gambling laws. When the defendant's duties as county prosecutor are prescribed by a general statute, it is unnecessary to plead the source of the duty for the courts will take judicial notice of them. It is only when duties arise under a special or private law that they must be pleaded, *State v. Weleck,* 10 *N. J.* 355 (1952), *supra.*

Concerning the allegations of a breach of duty, the defendant argues that insufficient facts are alleged to show wherein defendant violated his duty. The defendant maintains that the indictment should inform him of the steps he should have taken in each situation in order to carry out his duties as prosecutor. Here the charge is nonfeasance, a charge of doing nothing, when by statute he has the duty of "detection, arrest, indictment and conviction." The defendant failed to

take steps to accomplish these objectives. It is unnecessary for the indictment to inform the defendant that he should have "detected" when he received information of illegal gambling activities. These contentions have been disposed of in earlier cases of nonfeasance in office. In *State v. Donovan*, 132 *N. J. L.* 319 (*Sup. Ct.* 1945), the mayor and other public officials of Bayonne were indicted for nonfeasance in office in failing and refusing to take suitable steps for the prosecution of flagrant offenses on a large scale. The indictment did not inform the defendants as to what steps they should have taken to fulfill their duties. In rejecting the defendant's contention that the indictment was deficient the court said:

"The first ground on which it is argued that the indictment should be set aside relates to matters of form. As to this, it is sufficient to say that our examination of the indictment fails to indicate any irregularity in that regard. It charges in plain terms that the defendant officials were public officers of the City of Bayonne whose duty it was to see that the law was not broken in that city, and that they willfully, with knowledge, or because of culpable negligence, failed to take suitable steps to remedy criminal conditions of which they were fully aware and which were of public notoriety. It is argued, as a branch of this point, that the duties of the defendants as public officers are confined to those specified in ordinances and resolutions of the board of commissioners and what is called 'a written specification of the duties of the deputy director of public safety,' and that the indictment fails to allege any breach of such duties. But this seems to us to fly in the face of ordinary common sense. One of the fundamental duties of a police department, from chief of police to patrolman, is to be on the lookout for infractions of the law and to use due diligence in discovering and reporting them, and in a proper case arresting the perpetrator and lodging and prosecuting a proper complaint. Detective bureaus are a common institution in cities; disorderly houses are all too common, and keeping a disorderly house is one of the commonest of crimes. Part of the duty of a city commission is to take suitable steps by way of prevention and prosecution of disorderly houses, and for a willful (and perhaps for an unduly negligent) breach of that duty, the officers responsible for its performance are liable."

In *State v. McFeeley*, 136 *N. J. L.* 102 (*Sup. Ct.* 1947), the indictment charged the defendants in almost the identical language with that used here with the duty of preserving peace and suppressing gambling and alleged that they un-

lawfully and willfully neglected and omitted to enforce the laws. In rejecting the contention that the indictment failed to state the nature and particularity of the accusation Chief Justice Case said in his opinion for the court:

"The failure to initiate proper complaints against the persons there arrested, is plainly identified. The particularity is obvious. The nature of the accusation is manifest from the close adherence to the provisions of the statute. The words 'willfully and unlawfully did make and take what is commonly known as a book, upon the running of horses, mares and geldings' have been held to have the clarity and certainty of statement requisite to apprise persons indicted for that misdemeanor of the offense they are called upon to meet. *State v. Morano*, 134 *N. J. L.* 295. If that language is sufficiently certain in an indictment charging the main offense, it is likewise sufficient in an indictment charging a police officer with misconduct in not prosecuting that offense."

The first 16 counts are sufficient. Each satisfies its fundamental purpose of informing the defendant of the nature of the charge against him.

As to the last three counts, we reach a similar conclusion and for the same reasons. Each count again sets forth the defendant's duties, his knowledge of the existence of a named corrupt official, the date when the defendant received this information, and his failure to take reasonable and lawful means for the "detection, arrest, indictment and conviction" of such official. The defendant was adequately informed of the nature of the charge against him. The defendant makes much of the fact that each of these three counts fails to specify the charge against the named official but merely labels him as a "corrupt public official." It must be remembered, however, that the purpose of the indictment is to inform the defendant of the nature of the charge against him. He is here charged with doing nothing. If he needed further information for his defense, he might have sought it by a bill of particulars under *Rule* 2:4–14.

The power to quash an indictment rests in the sound discretion of the trial judge, but this discretion should not be exercised "except on the plainest ground," *State v. Ellenstein*, 121 *N. J. L.* 304, 325 (*Sup. Ct.* 1938), or on

"the clearest and plainest ground," as it was put in *State v. Davidson*, 116 *N. J. L.* 325, 328 (*Sup. Ct.* 1936), or unless the indictment is "palpably defective," *State v. Russo*, 6 *N. J. Super.* 250, 254 (*App. Div.* 1950), especially where the statute of limitations has run, *State v. Tilton*, 104 *N. J. L.* 268, 274 (*Sup. Ct.* 1928), *State v. Acton*, 9 *N. J. Misc.* 55, 58 (*Sup. Ct.* 1931). Our courts have repeatedly held that "discretion ought not to be exercised in a case like this where injustice may be done thereby to the state and where the refusal to exercise it deprives the defendants of no substantial rights." *State v. Lehigh Valley Railroad Company*, 90 *N. J. L.* 372, 376 (*Sup. Ct.* 1917).

From what has been said in discussing the various points raised here the conclusion is inescapable that the trial court abused its discretion in dismissing the indictment.

The judgment is reversed.

WACHENFELD, J. (dissenting). Nowhere in the State's brief is the admission made, but on oral argument it was frankly conceded that the defendant was a *quasi*-judicial officer and the performance of his duties required the use of wide discretion.

The inquiry, therefore, is whether or not in making a decision as to what, if anything, he was to do under the given circumstances, he could be indicted if his conduct was not corrupt or with evil intent.

Paralleling the presumption of innocence recognized everywhere without exception in the criminal law, there is also the natural presumption that an innocent man's motives are good. So, until the contrary is charged or alleged, the act of a *quasi*-judicial officer involving a matter of discretion is presumed to be with good motive.

If the presumption is given its customary weight, in construing the indictment concerned we encounter the anomalous situation constituting that which is good as criminal. The result is incongruous.

Other prosecutors have been indicted and convicted of improper conduct in office but only after they were charged

with doing the things complained of "corruptly and with evil intent." *State v. Bolitho,* 103 *N. J. L.* 246 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 446 (*E. & A.* 1927); *State v. Jefferson,* 88 *N. J. L.* 447 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 507 (*E. & A.* 1917).

The State openly acknowledged on argument that there was not a single authority to support its position in a cause involving the one held by the respondent and attributed the omission in the document in question to "bad draftsmanship," which we are asked to repair by judicial treatment.

The respondent emphasizes the uniqueness of the indictment to be construed, avowing: "For the first time in the history of the United States and of England as well, a prosecutor is here charged with criminal liability for nonfeasance without allegation of corruption or bad motive."

The asserted liability does not arise from statute but is founded in the common law.

Criminal law is not co-extensive with morality, and an act is not a crime merely because it is wrong. The judiciary has no inherent power to make an act criminal. That can only be accomplished by the Legislature, and, in the absence of a prohibition by law, no act is a crime however wrong it may seem. Human shortage, unaccompanied by corruption or bad faith, does not constitute criminality.

There are different classes of conduct. One is criminal, another is immoral, and a third is unethical or improper. The latter are molded and graded by public reaction and opinion, but no matter how scathing or justified the public expression may be, the conduct condemned does not become a crime until the Legislature has so classified it.

The definition ascribed by Webster to "corrupt" is: "changed from a state of uprightness, correctness, truth, etc., to a bad state," while "evil" is defined as: "having or exhibiting bad moral qualities, morally corrupt, wicked." Either definition describes what I am attempting to express, to wit, the difference between criminal and civil conduct.

In this category, before a man can be branded a felon and incarcerated, he must have left the path of righteousness

and become "morally corrupt." That transition legally is not presumed by what he does; it must be specifically alleged and charged, and either word would be sufficient in so doing.

"The constituents of a criminal offense at common law are an evil intention and an unlawful act." *State v. Labato*, 7 *N. J.* 137 (1951). One of the constituents in the indictment here, according to our own decision, is absent, to wit, evil intention. We so held in the above case.

The indictment contains no such allegation and is therefore, in my view, plainly defective.

For these reasons, plus my inability to agree with the majority that a prosecutor, in relation to other law enforcement agencies, has a "primary responsibility for the enforcement of the criminal law," I would sustain the court below.

OLIPHANT, J. (dissenting). The indictment for nonfeasance with which we are here concerned consists of 19 counts. The first 16 counts are basically similar and proceed on the assumption, as does the majority opinion, that the Prosecutor of the Pleas of Bergen County, a county which consists of 70 municipalities having 887 police officers, is charged with a primal duty as a police and peace officer by *R. S.* 2:182–5 which provides:

"Each prosecutor of the pleas shall be vested with the same powers and subject to the same penalties, within his county, as the attorney general shall by law be vested with or subject to, and he shall use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws."

The first count of the indictment charges the defendant with the public duty of using and exercising and causing to be used and exercised all proper, reasonable and effective means and all lawful means for preserving the public peace and insuring good order in the said County of Bergen, and for suppressing all disorderly houses wherein gaming, betting, bookmaking, etc. were conducted and operated and for failing to enforce the laws of this State relating to gambling. Then it alleges specifically that a gambling operation was conducted at a specified address during a specified period and

that Walter G. Winne "well knowing the premises aforesaid but disregarding the public duty by law so enjoined upon him, then and there continuously, unlawfully and wilfully did neglect and omit to perform the said public duties and failed and omitted to use all proper, reasonable, effective and diligent means within his power as the Prosecutor of Bergen County for the detection, arrest, indictment and conviction of a person or persons who kept and maintained the gaming house as aforesaid."

The basic question to be determined then is whether the Prosecutor of the Pleas by virtue of the provisions of this statute, *R. S.* 2:182–5, has the primary and dominant responsibility in the county as the majority opinion assumes, to detect and arrest any person who violates any of the criminal statutes or the common law with respect to crimes in the county in which he has jurisdiction. The section in question does two things: it invests him with the power that the Attorney-General shall by law be invested with or subject to, and secondly, it requires that he shall use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the law.

The primal police duty argued for in this case, it must be conceded, was never in the Attorney-General. The Attorney-General was originally the principal law enforcement officer insofar as the prosecution of the pleas in this State was concerned and it was not until 1822 that the appointment of a person to prosecute the pleas in each county was authorized by statute. This statute appears in *Nixon's Digest* of 1846, *page* 52. But this statute is not the forerunner of the section here in question, as the State contends. During all the period of time from the adoption of the Constitution of 1776 up to 1874 the peace officers of this State were the sheriff, and the various constables and policemen appointed in the various municipalities. They were charged with the primal duty as police officers for the detection and arrest of violators of the criminal law.

As of today the sheriff is still possessed of all his common law powers as a police officer which are specifically set

forth at some length in 1 *Blackstone* \*344; 1 *Chilly's Criminal Law* \*25. See the notes in *Elmer's Digest, page* 452. There is nothing in the statutes abolishing these common law duties of the sheriff, so I have come to the conclusion that he still has the primal power as a police and peace officer in the county, where necessary, to arrest any one on a criminal charge.

Such was the state of the law when the predecessor statute of *R. S.* 2:182–5 was originally enacted by law. This statute was not enacted for the first time in 1898, as suggested by the State or in the majority opinion, and the section does not reflect, as the majority contends, a legislative response to problems of law enforcement that were reflected in the rapidly increasing population of the State, and in the complexities of life in many urban communities and in the need for the concentration of authority in the county for the detection, arrest and indictment of criminals. This State was a distinctly rural community when this statute was originally enacted and none of the reasons urged in support of the construction placed on the statute by the majority was in existence at the time.

The section first appeared and was enacted in the *Revision of* 1874. The statute enacted is not found in the public laws because it was part of the revision authorized in 1871 and popularly known as the "Revision of 1877." The particular section is found in the "Revised Statutes" 1874–1875, page 237, section 100, which revised statutes were enacted by an act having the following title: "An act regulating proceedings in criminal cases," approved March 27, 1874, effective January 1, 1875.

This revision of the criminal laws was compiled and arranged by Chief Justice Beasley, Justice Depue and Courtland Parker.

In *Lindabury v. Freeholders of Ocean*, 47 *N. J. L.* 417, at *page* 423 (*Sup. Ct.* 1885), Mr. Justice Depue stated:

"In *State, Lewis, pros. v. Hudson County*, already cited, this court, while it affirmed the obligation of the county to defray the expenses incurred in the due administration of justice, regarded the

obligation as a moral obligation merely, and, as the law then stood, the obligation was a moral obligation, in the sense that there was no statute which imposed the duty as a legal duty or prescribed any means for determining the amount that should be paid. Hence the court in that case treated the whole subject as being within the discretion of the board as to whether such expenses should be paid, and left it discretionary with the board as to the sum that should be paid. To meet this condition of affairs section 100 of the Criminal Procedure Act was passed. That section enacts that 'it shall be the duty of the prosecutor of the pleas for each county to use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws; and all necessary expenses incurred thereby, verified to and approved under his hand, by the presiding judge of the Court of Oyer and Terminer or General Quarter Sessions of the Peace for any county, shall be paid by the board of freeholders thereof.'

The language of the section quoted is quite general. It is made the duty of the prosecutor 'to use all reasonable and lawful diligence for the detection, indictment and conviction of offenders,' and the payment of 'all necessary expenses incurred thereby' is enjoined upon the board of freeholders. A construction of the statute which would restrict its provisions to the personal efforts of the prosecutor, and his personal expenses, without authority to employ other means and instrumentalities to aid him in the discharge of his duty, and to incur expense thereby, would be too narrow to effect the legislative purpose. On such a construction the prosecutor would not be able to have a diagram prepared, nor to have a chemical analysis made, nor to employ a detective, with any assurance that the expense necessarily incurred thereby would be paid. Such a construction would leave to a prosecutor an excuse for the lax performance of duty, that he had no authority to incur the requisite expense. The plain intent of the statute was to confer upon the prosecutor authority to provide reasonable means to aid him in the performance of his official duties, with a guaranty that the necessary expenses incurred should be paid; and it was left to the court by the certificate and approval of the presiding judge to determine the reasonableness of the means employed, and the necessity of the expenses incurred."

His remarks that a construction of the statute which would restrict its provisions to the personal efforts of the prosecutor at his personal expense would be too narrow, do not permit the inference that by the enactment of the statute it was intended to impose a primal dominant duty of a police and peace officer upon the prosecutor of the pleas. That would indeed be an unreasonable interpretation in view of the historical situation that existed where the sheriff was the

principal peace officer of the county and the local policemen and constables had the primal police duties in the municipalities.

The prosecutor of the pleas worked on a fee basis based upon pleas and indictments and it was not until 1877 when by *L*. 1877, *c.* 65, *p.* 97, that the prosecutor of the pleas was authorized to "appoint some suitable person to act as a special officer *for the detection, arrest, indictment and conviction* of offenders against the laws; *such person so appointed shall possess all the powers and rights, and be subject to all the obligations of constables and police officers in any county of this state * * *"* (Italics supplied).

Neither the State on the argument, nor the majority opinion, points to a single statutory provision that imposes such a duty upon the prosecutor except the one here in question. The 1877 statute just mentioned is the forerunner of the various statutory provisions for prosecutors' detectives and investigators now found in *R. S.* 2:181–1 *et seq.*, and these detectives are by these sections given "all the rights and powers of special deputy sheriffs, constables and police officers."

It should be noted right here that it was not until 1878 by *L.* 1878, *c.* 99, *p.* 165, that the prosecutor of the pleas in certain counties was put on a salary basis rather than a fee basis. The question should immediately arise in any one's mind that since there was no provision for the prosecutor to be paid on a fee basis for the arrest and detection of criminals in 1874, could the Legislature have intended to have imposed a primal police duty upon the prosecutor of the pleas when it made no provision for his remuneration?

Now, if it was intended by section 100 of the 1874 criminal revision that the prosecutor of the pleas should be charged with the primal police duty in the county why, in *State, Lewis v. Hudson County, supra,* did the court come to the conclusion that where the prosecutor of the pleas on his volition incurred such expenses for the detection of crime or the arrest of individuals, that the duty was a moral one rather than a legal one? Because if it was a legal duty, the

board of freeholders was bound to appropriate the money necessary for such work when requested by the prosecutor and there would be no reason for the enactment of this so-called section 100 whereunder the expenses so incurred are subject to the approval of the court. It seems to me that a clear reading of this 1874 act, as originally enacted, in view of all the historical facts then existing and the various duties of other police and peace officers charged with the preservation of the peace and the enforcement of the law, requires that the duty so imposed is purely discretionary.

The State in the argument concedes that the defendant was a *quasi*-juducial officer and the performance of his duties required the use of wide discretion. The State seems to readily concede that insofar as the indictment, prosecution and conviction of offenders against the law are concerned that the duties of the prosecutor of the pleas is a discretionary one. Certainly it could not be argued that a prosecutor has no right in the absence of a corrupt motive to *nolle pros* an indictment.

The words "indictment" and "conviction" occur in the same series of words with the words "detection" and "arrest" and it would seem to me that the maxim *noscitur a sociis* would apply, and this maxim represents a conclusion that considering the language of the entire act, its subject matter, and the available evidences of the legislative intent, that the interpretation of the court must be consistent with the legislative purpose. 2 *Sutherland Statutory Construction, section* 4908.

The indictment, and the majority opinion, proceeds on the assumption that as to prosecution and conviction the statutory provision is discretionary but as to detection and arrest it is mandatory insofar as primal police duty is concerned. Such a basic distinction of this should not be read into the statute in the absence of a clear expression of legislative intent.

When the statute was originally enacted, *Revised Statutes,* 1874, *section* 100, *page* 237, it consisted of two clauses. The first clause set forth the general duty now found in

*R. S.* 2:182–5 and the second clause provided for the payment of expenses incurred by prosecutors of the pleas on approval of the Judge of Oyer and Terminer or General Quarter Sessions, now *R. S.* 2:182–7. The statute should be read as a whole, and the mere fact that the revisors of 1937 separated the statute into two sections does not change the original legislative intent.

I therefore conclude that it was not the legislative intent that the prosecutor of the pleas was vested with primal police powers for original arrest and detection of crime as was conferred by the common law on the sheriffs and by various other statutes on deputy sheriffs, constables, police officers and county detectives. If he has such power then he is primarily or dominantly responsible for keeping and preserving the peace of the county in each and every municipality, and I do not think that such was the intention of the original enactment in 1874.

The prosecutor of the pleas cannot give the local policemen orders. If he has knowledge of violations and calls for their help and they refuse or adamantly avoid performing their duty, then he can proceed against them by indictment or presentment, but to say he has a primary responsibility over and above their omissions or derelictions of duty to arrest and detect crime in the county places upon him a duty which he could not possibly enforce or carry out with the forces and powers at his personal command.

Superior Court Judge Hughes in dismissing the indictment based the dismissal principally upon the want of any allegation that the defendant acted corruptly or with evil motive. In the two cases where prosecutors have been indicted in this State, in each indictment they were charged with doing things corruptly and with evil intent. *State v. Jefferson*, 88 *N. J. L.* 447 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 507 (*E. & A.* 1917); *State v. Bolitho*, 103 *N. J. L.* 246 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 446 (*E. & A.* 1927).

The State has not cited any cases where a prosecutor or prosecuting attorney has been indicted for nonfeasance under the facts and circumstances here presented. All the cases

they rely on, some of which are quoted from in the majority opinion, are causes where a prosecutor or prosecuting attorney or some other officer was removed from office in a removal proceeding, which is an entirely different situation from an indictment for a crime. In such a proceeding the respondent only loses his office and the perquisites thereof. These are of minor consequence when compared with the penalties which are imposed on a conviction for a crime.

What we are concerned with here is a criminal offense at common law, and the constituents of such an offense are an evil intent and unlawful act. *State v. Labato,* 7 *N. J.* 137 (1951). The situation is likewise different where the criminal offense is based upon a statute. The Legislature may, if it will, make an act criminal without regard to criminal intention; hence it has been held that in the absence of express words in the statute, making the act criminal, there must be a charge in the indictment that the offense was committed with an evil intent or unlawfully. 1 *Russell on Crimes* 49; *Bishop on Statutory Crimes, section* 132; *State v. Startup,* 39 *N. J. L.* 423 (*Sup. Ct.* 1877).

The State's contention is that it is not necessary to assert a corrupt motive or evil intent for failure to act or to support an indictment for nonfeasance and they rely largely on *State v. Jefferson, supra,* and they excise from the opinion a particular sentence as follows:

"Indeed, such an agreement, or even such payments or receipts of money were not essential to the offense of malfeasance, which, without doubt, might be as fully committed for reasons of personal favoritism or for political reasons or for no known reason at all."

There the indictment was for malfeasance and there was a corrupt agreement not to prosecute in consideration of the payment of money. There was no charge in that indictment of mere nonfeasance. (See *State of Case, vol.* 772, *Court of Errors and Appeals Briefs* 1919, *page* 29).

But aside from this difference in the two cases certainly any act done by the prosecutor of the pleas for money or for

personal favoritism or political reasons which would result in the indictment or conviction of any person or the acquittal of a guilty person would be an act done with a corrupt motive or evil intent. I do not think that could be argued by anybody. As to the phrase of Mr. Justice Garrison, "for no known reason at all," if it means anything, for it seems to be gratuitous and dicta, it can only be interpreted to mean that no one reason was expressly established by the direct evidence before the court, but from all the facts and circumstances an inference of corrupt motive or evil intent could be drawn.

From time immemorial a common law crime consists of two elements, a charge of criminal intent and a description of the criminal act. The authorities above referred to are the only authorities cited by the State that are even partially persuasive to support their argument that a corrupt motive or evil intent is not of the essence of the crime of malfeasance or nonfeasance.

The cases of *State v. Donovan,* 132 *N. J. L.* 319 (*Sup. Ct.* 1945), involving the director of the police department, which department has prime authority as peace officers and arresting officers in the municipality, and *State v. McFeeley,* 136 *N. J. L.* 102 (*Sup. Ct.* 1947), are not in point. In the *McFeeley* case the gist of the indictment was that a raid had been made upon a gambling place and certain paraphernalia had been confiscated but no effective steps had been taken for the arrest and prosecution of the operators of the place who apparently were not even arrested. Certainly a corrupt motive or evil intent could be spelled out from such facts and circumstances.

Here it should be said that the record of indictments and pleas taken in Bergen County since the present investigation started under the direction of the Attorney-General proves beyond any peradventure of doubt that gambling as an organized business was rampant in the county, and the conclusion necessarily follows that such a situation was the result of the failure of the 887 police and peace officers of the county to perform their duty under the law.

It seems to me that the breakdown of law enforcement in Bergen County is on the doorstep of the police department in the original instance. It is an over statement to argue, as the State does, that the State will be virtually powerless in the face of laxness, opposition or indifference on the part of the prosecutors of the pleas. This to me is nonsense in view of the tremendous number of policemen and peace officers we have in this State who have the primal duty to enforce the laws and to make the original arrests.

True, the indictment in this case contains 19 counts, 16 of which are similar, but the number of counts add nothing to the validity of the indictment, because if the first count is invalid in law the mere fact there are 16 others of similar import will not make out a crime on the part of the prosecutor of the pleas.

Examining the first count of the indictment, it seems to me that the essence of this count is that the prosecutor had a primal police duty, and secondly that the defendant knew of the gambling operations on a specified premise on the particular date set forth; but there is no indication as to how he knew. The statement in the majority opinion, "according to the indictment the defendant received reliable information of 19 cases in which the laws of New Jersey were being habitually violated," relates only to the last three counts hereinafter discussed and not to the first 16.

The phrase in the first 16 counts that the defendant "well knowing the premises aforesaid, but disregarding the public duties so by law enjoined upon him * * *," is vague and indefinite. If he did not know he did not have any duty in the premises, and if the State alleges he did know it seems to me that in order to make this indictment valid they should specify how and by what means he knew because that is the thing, and the one thing alone, that he will have to meet on the trial of the case. And, while they admit the defendant can get such information by a bill of particulars, it seems to me that when such a fact is of the very essence of the indictment it is necessary to plead such facts specifically because it is upon the existence of these facts that the element

of the breach of duty is alleged. Not only should the indictment charge specifically how he knew but that he knew that the place was being used for a gambling resort.

In the *McFeeley* case, *supra*, because of the raid they knew and that was clear, but here the situation is entirely different. It is one thing to charge an ordinary police officer with knowledge of the commission of a crime, but it is an entirely different thing to charge a prosecutor of the pleas generally with knowledge of any and all crimes committed in his county. An ordinary policeman or peace officer is in an entirely different position as far as his duties are concerned. He is in charge of a specified area and is under the duty to patrol and inspect it physically so as to preserve the peace and preserve order, and if he fulfills these duties as he is required by law to do, then of course it can be assumed that if these violations were occurring they would come within his observation or knowledge if he were at all diligent. No such duty of policing is imposed by the statute on the prosecutor of the pleas. Such information as he receives with respect to the commission of crime must come through various sources (1) police channels, (2) matters referred to the grand jury by the local magistrates, (3) complaints filed with him, and (4) information that he receives from his assistant prosecutors or county detectives or people appointed by him to make such investigation as he deems necessary. Insofar as his subordinate employees are concerned, it must be presumed they did their lawful duty in the absence of an allegation that they were failing in their duty in specified instances and the prosecutor knew and was aware of it. In this respect I consider the indictment defective for failing to state the sources of knowledge upon which the alleged breach of duty rests.

The majority opinion contends that the use in the indictment of the phrase "unlawfully and wilfully" negatives the exercise by the defendant of good faith. Such a phrase will support a criminal complaint where the Legislature by statute has not made a criminal intent the essence of a crime as before adverted to, but where a criminal intent or corrupt

motive is the essence of a crime it must be alleged in the indictment and it is not enough to say that "unlawfully and wilfully" negatives the exercise by the defendant of good faith.

The majority opinion seems to concede that most of the reputable authority supports the proposition that an indictment for a common law offense must allege that the defendant willfully, corruptly neglects and declines an official duty; but in reliance on some contra-authority it draws such comfort as can be gotten from the remarks in *State v. Jefferson, supra,* discussed above, which I feel are not applicable to this indictment.

While I dissented in *State v. Weleck,* 10 *N. J.* 362 (1952), I think that that situation is entirely distinguishable from the instant case for there there was no question as to what the general duty was, and one of the questions involved was whether other duties incidental thereto or reasonably related thereto should be set forth in the indictment.

The majority opinion relies on *State v. Weleck, supra,* to support the indictment here under consideration and I agree that where duties are imposed by law, whether by statute, special or private law, municipal charter or arising out of the very nature of the office itself, the duties need not be specifically set forth in the indictment, but I do not feel myself bound by a statement in that case which I consider dicta and found on *page* 369, reading as follows:

"The argument that the second duty of a borough attorney alleged in the indictment is not a duty of office prescribed by law but a mere ethical limitation or principle of behavior is likewise untenable. If a public officer were under no duty imposed by law to regulate his official conduct in accordance with basic moral principles, then he could violate such principles and still be immune from indictment and prosecution for misconduct in office. We recognize no such divorce of morals from the duties of public office."

Criminal law and morality are not the same thing. The above quoted statement is entirely too broad if it is not limited to the proposition that the moral conduct involves something that is *malum per se* rather than *malum prohi-*

*bilum.* Then within reasonable limits it is true that there are certain violations of moral law about which there can possibly be no dispute and upon which all can agree that they are incident to the duty of any office where the rule might be applied, but there are other principles of morals and ethics about which theologians can differ and on which they have carried on their art of disputation over the centuries. In this field the proposition of the moral rightness or wrongness of gambling is one upon which there is a great difference of opinion. There is one line of thought that gambling itself is not *malum per se,* except under certain extreme circumstances. There is another line of thought which considers it *malum per se* under any and all circumstances. In this State many forms of gambling are *malum prohibitum.* It seems to me it is not the function of this court to attempt to spell out whether a certain act is *malum per se* or *malum prohibitum.* Many an act may be morally wrong, yet not be a crime. And in practically all situations a question whether an act should become *malum prohibitum* is strictly within the function of the Legislature and not of this court. On such a proposition the people have the right to be heard through their elective representatives in our form of government, and it would be an unusual proposition to assert that a court has the duty through its decisions of promulgating moral or ethical rules to supplement an omission, deliberate or otherwise, on the part of the Legislature in defining certain acts of commission or omission on the part of the citizens as *malum prohibitum.*

This is a cause in which it can well be said that the case of one single man is the affair of all. One may get a bad public reputation without ever having committed a crime. It is too often asked, "But what are you complaining about? Up to now, no good man has been slandered or hurt." I make the point that it is not a question whether this is true or false but that the reputation of a bad man is as important politically or juridically as that of any other. The law looks on both with an equal eye and the breach of the law for the purposes of trapping a reputedly bad man involves

the risk of civil liberties and may necessarily be the beginning of the end of civil liberties for all. Hard cases make bad law.

I have concluded that the first 16 counts of the indictment are bad: (1) for alleging a primal police duty is imposed upon the prosecutor of the pleas by statute; (2) failure to allege a corrupt or evil motive; and (3) the failure to state the source of knowledge imputed to the prosecutor of the alleged gambling violations.

The statement in the majority opinion, "according to the indictment the defendant received reliable information of 19 cases in which the laws of New Jersey were habitually violated," is inaccurate. There isn't a single allegation in the first 16 counts concerning what reliable information the prosecutor has. These counts name the 19 alleged gambling houses, and it is only in the last three counts that it is indicated that the prosecutor had certain alleged complaints about corrupt officials. Single allegations from the different counts of the indictment cannot be transposed by inference into the other counts of the indictment to sustain such counts.

As to the last three counts in the indictment, I concur in the reasoning and conclusions of Judge Hughes below where he held that the statement in the indictment that the prosecutor received complaints that certain officials were "corrupt officials" is meaningless in law, vague and uncertain and that it is a mere epithet and is lacking in the definiteness necessary to sustain a valid indictment.

I would affirm the judgment below.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, BURLING, JACOBS and BRENNAN—5.

*For affirmance*—Justices OLIPHANT and WACHENFELD—2.