710 A.2d 586 (1998)
311 N.J. Super. 517
Glenn CHERRITS, Plaintiff-Appellant,
v.
VILLAGE OF RIDGEWOOD, a municipality incorporated under the laws of New Jersey, Defendant-Respondent, and
Louis J. Mader, Robert Preston, James Rice, Scott Stephen, Bush/Quayle, `92 General Committee, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued April 7, 1998.
Decided May 29, 1998.
*587 Donald Horowitz, Hackensack, for plaintiff-appellant (Mr. Horowitz, on the brief).
George W. Connell for defendant-respondent (Connell, Foley & Geiser, Roseland, attorneys; Mr. Connell, of counsel; Marc D. Haefner, on the brief).
Before Judges KEEFE, PAUL G. LEVY and WECKER.
The opinion of the court was delivered by KEEFE, J.A.D.
Plaintiff, Glenn Cherrits, appeals from the entry of summary judgment in favor of defendant, Village of Ridgewood (Ridgewood), in this civil rights action brought by plaintiff pursuant to 42 U.S.C. §§ 1983 and 1985(3). On appeal, the question is whether there is a genuine issue of fact as to Ridgewood's liability for the conduct of its Chief of Police, defendant Louis J. Mader (Chief Mader).
Plaintiff filed a complaint against Ridgewood, Chief Mader, Ridgewood Officers Robert Preston and James Rice, the Bush/ Quayle `92 General Committee, Inc. (Committee), and Bush/Quayle `92 General Committee, Inc. member Scott Stephen (Stephen), in January 1995. In his eight count complaint, plaintiff alleges that the defendants deprived him of various constitutional rights in violation of 42 U.S.C. §§ 1983 and 1985(3).[1]
Defendant Ridgewood moved for summary judgment on both the § 1983 and § 1985 claims. Judge Doyne heard argument on September 15, 1995, and issued a bench decision on that day. As to the § 1983 claim, Judge Doyne granted defendant Ridgewood's motion.
With regard to the application as it relates to the 1983 action, the motion is granted. The municipality cannot be held liable under section 1983 based upon a respondeat superior theory. The plaintiff must establish the governmental policy and its causality to the injury and the constitutional violation. Here, plaintiff has failed even to identify the government policy. If the policy is to fail to adequately train, which *588 appears to this court to be an oxymoron, then plaintiff must then show deliberate indifference.... Plaintiff has failed to do so. Accordingly, as it pertains to ... section 1983, defendant's application is granted.
With regard to the § 1985(3) claim, Judge Doyne denied the motion. Recognizing that there were some factual issues that had to be developed on the conspiracy issue, the judge granted plaintiff's motion to compel discovery regarding the arrangement between Ridgewood and the Committee concerning security at the rally.
Thereafter, Ridgewood moved for reconsideration of the court's denial of its motion for summary judgment on the § 1985 issue. The plaintiff cross-moved for reconsideration of the court's decision to dismiss the § 1983 count against Ridgewood.
On February 28, 1996, Judge Doyne issued a written opinion in which he concluded that "plaintiff has presented no competent evidence of any kind that would allow a reasonable factfinder to conclude that the Village and the Committee conspired to injure him in the manner proscribed by § 1985(3)." Accordingly, on the § 1985(3) count, the judge granted summary judgment in favor of defendant Ridgewood. Plaintiff's motion for reconsideration of the September 15 decision was denied. This appeal followed.

I.
On October 22, 1992, the Committee scheduled a rally for then-incumbent President George Bush in support of his bid for re-election. The Committee leased Veteran's Field in Ridgewood for the event, and President Bush was scheduled to speak at the rally.
On the morning of the event, Chief Mader met with Committee chairman William Palatucci to discuss the police officers' role in security for the event. At that time, the two discussed the procedure by which criminal complaints would be filed should the need arise. Palatucci informed Chief Mader that only those members of the Committee who possessed a copy of the lease between Ridgewood and the Committee would have authority to sign a criminal complaint.
Plaintiff, who was a registered Democrat and supporter of the challenger, now-President William Clinton, decided to attend. He, along with a friend, went to Veteran's Field before the expected start time of 3:00 p.m. and acquired tickets to attend the rally.
Plaintiff joined a group of approximately 10-15 people who were also Clinton supporters. According to the plaintiff, the members of the group were holding signs and chanting in support of Clinton. Plaintiff held a sign of his own and chanted along with the others.
According to the plaintiff, at some point while the group was standing at the entrance to the field, Chief Mader, along with a Committee member, defendant Stephen, approached the group and had a discussion with other members of the group and then left. Plaintiff testified that he did not overhear what was discussed.
Stephen subsequently approached the group on a few occasions, saying something to the effect, "If you don't move, you're going to be arrested." Although not aware who Stephen was at the time, plaintiff assumed that Stephen was a staff person because he was wearing buttons to that effect. On one occasion that Stephen addressed the group, plaintiff told Stephen that they were doing nothing wrong, and that "he would probably be advised not to continue trying to get (them) to move." A short time later the group was again approached by Chief Mader and Stephen, and Chief Mader requested that the group move to another location. The group moved without objection.
At their new location, the group continued to wave their signs and chant. Soon thereafter, the group was once again approached by Chief Mader and Stephen. Plaintiff was informed by other witnesses that there was discussion between Chief Mader and Stephen about the lease. When asked if he had any discussion with Stephen or Chief Mader at this time, plaintiff responded: "There may have been a discussion [but] I can't recall the substance of it." In any event, plaintiff overheard Stephen ask Chief Mader to arrest plaintiff, and Chief Mader directed two officers *589 to do so. Plaintiff was arrested but not handcuffed. He was detained for approximately an hour and then released.[2] The trespassing complaint against plaintiff was later voluntarily dismissed by Stephen.

II.

PLAINTIFF'S § 1983 CLAIM
We will assume for the purpose of discussion that plaintiff's arrest was without probable cause because he was not committing a disorderly persons offense in the presence of the arresting officers; that his invalid arrest resulted in an unconstitutional infringement on his freedom of political speech and assembly; and that his incarceration was an unwarranted and unconstitutional infringement of his liberty interests.
Section 1983 provides, in relevant part, that,
Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

[42 U.S.C. § 1983.]
Prior to 1978, municipalities did not fall within the definition of a "person" for purposes of § 1983. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). That, however, changed in 1978 with the seminal United States Supreme Court decision in Monell v. Department of Soc. Serv. of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
In overruling Monroe, and dismissing the holding in that case as a "departure from prior practice," the Court held that Congress intended for "municipalities and other governmental units to be included among those persons to whom § 1983 applies." Id. at 690, 98 S.Ct. at 2035, 56 L.Ed.2d at 635. In recognizing municipal liability under the statute, however, the Court prohibited the imposition of liability on the theory of respondeat superior. Id. at 694-95, 98 S.Ct. at 2037-38, 56 L.Ed.2d at 637-38. Rather, the Court held that liability may only attach to a governmental entity where the plaintiff proves that some governmental policy or custom caused their injury. It is only where the execution of the governmental policy or custom is the "moving force of the constitutional violation" where the public entity may be liable under § 1983. Id. at 694-95, 98 S.Ct. at 2038, 56 L.Ed.2d at 638.
Following Monell, it was clearly understood that formal, adopted legislative policy of a local government could potentially expose the governing body to liability under § 1983. However, because the Court never reached the issue of what other informal, unadopted acts of government officials may constitute "municipal policy," see id. at 695, 98 S.Ct. at 2038, 56 L.Ed.2d at 638, lower courts struggled with the task of determining when a de facto "policy" or "custom" existed, and "whose edicts or acts may fairly be said to represent official policy." See Colleen R. Courtade, Annotation, What Constitutes Policy or Custom for Purposes of Determining Liability of Local Government Unit under 42 U.S.C.A. § 1983Modern Cases, 81 A.L.R.Fed. 549, 557 (1987). Needless to say, this uncertainty produced mixed results in the lower courts. Id. at 558.
In Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court attempted to define the contours of public entity liability under § 1983. There, the Court recognized that a governmental "policy" may be advanced through a "single decision" of a policymaking official. Id. at 480, 106 S.Ct. at 1298, 89 L.Ed.2d at 463.
In Pembaur, the plaintiff's § 1983 action arose from an instance in which law enforcement officials, at the direction of the county prosecutor, were instructed to forcibly *590 break into the plaintiff's clinic to execute a capias.[3]Id. at 472-74, 106 S.Ct. at 1293-94, 89 L.Ed.2d at 458-59. Plaintiff subsequently brought a § 1983 action against the City of Cincinnati, the County of Hamilton, and others for alleged violations of his Fourth and Fourteenth Amendment rights. Id. at 474, 106 S.Ct. at 1292, 89 L.Ed.2d at 459. The district court dismissed plaintiff's complaint against the city and county on the basis that the officers were not acting pursuant to the kind of "official policy" necessary to trigger liability under Monell. Id. at 475, 106 S.Ct. at 1296, 89 L.Ed.2d at 460. The Sixth Circuit Court of Appeals affirmed.
In reversing the decision of the lower courts, the Supreme Court recognized that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Id. at 480, 106 S.Ct. at 1298, 89 L.Ed.2d at 463. Thus, where the "acts or edicts [of a municipal official] may fairly be said to represent official policy," such decisions may give rise to municipal liability under § 1983. Ibid.
In reaching this decision, however, the Pembaur Court emphasized that "not every decision by municipal officers automatically subjects the municipality to § 1983 liability" and, further, that liability will not be imposed, pursuant to Monell, based simply on a theory of respondeat superior. Id. at 481, 106 S.Ct. at 1299, 89 L.Ed.2d at 464. "[O]nly where ... a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter" will liability attach to the municipality. Id. at 483, 106 S.Ct. at 1300, 89 L.Ed.2d at 465 (emphasis added). Thus, in order for liability to be imposed against a municipality under § 1983, the plaintiff carries the burden of demonstrating the existence of a particular municipal policy or custom, and further proving that such policy subjected or caused him to be subjected to constitutional injury. See City of Oklahoma v. Tuttle, 471 U.S. 808, 829-30, 105 S.Ct. 2427, 2439, 85 L.Ed.2d 791, 807-08 (1985) (Brennan, J., concurring).
Against this backdrop, we examine plaintiff's § 1983 action. Plaintiff offers eleven municipal "policies" that he claims were created by Chief Mader's conduct.
(a) The policy of allowing Chief Mader to conspire and agree with William Palatucci, Executive Director ... [of the Committee], to prohibit the exercise of free speech by Democrats and by supporters of Bill Clinton, the Democratic candidate for President.
(b) The policy of prohibiting the exercise of freedom of speech on public property by Democrats and by supporters of Bill Clinton, the Democratic candidate for President.
(c) The policy of preventing by force, intimidation or threat, any citizen who is lawfully entitled to vote from giving his support or advocacy in a legal manner toward or in favor of electors supporting Bill Clinton, the Democratic candidate for President.
(d) The policy of allowing Chief Mader to conspire and agree with William Palatucci... to prohibit the exercise of the right to peaceable assemble with others by Democrats and by supporters of Bill Clinton, the Democratic candidate for President.
(e) The policy of prohibiting the exercise of the right to peaceable assembly with others on public property by Democrats and supporters of Bill Clinton, the Democratic candidate for President.
(f) The policy of allowing Chief Mader to conspire and agree with William Palatucci... to prohibit the exercise of their right to be secure in their persons against unreasonable searches and seizures by Democrats and supporters of Bill Clinton, the Democratic candidate for President.
(g) The policy of prohibiting the exercise of their right to be secure in their persons against unreasonable seizures on public property by Democrats and supporters of Bill Clinton, the Democratic candidate for President.

*591 (h) The policy of allowing Chief Mader to conspire and agree with William Palatucci... to prohibit the exercise of their right not to be deprived of their liberty without due process of law by Democrats and supporters of Bill Clinton, the Democratic candidate for President.
(i) The policy of prohibiting the exercise of their right not to be deprived of their liberty without due process of law by Democrats and supporters of Bill Clinton, the Democratic candidate for President.
(j) The policy of deliberately failing to train its police in the proper protection of the constitutional rights of persons who would attend or attempt to attend the Bush Rally and express his/her pro-Democratic, pro-Clinton ideas and preferences.
(k) The policy of failing to adequately train, instruct and supervise the members of its police department [i.e., Mader, Preston and Rice] regarding the making of arrests. This policy equates to a policy of deliberate indifference to safety, lives and liberty of persons, such as Plaintiff, in the Village of Ridgewood.
In response to these claims, Ridgewood argues that these alleged "policies," presented in plaintiff's amended answers to interrogatories, were not raised by plaintiff until after Judge Doyne granted summary judgment. We need not resolve this factual dispute.
Claims b, c, e, g, and i essentially allege that Ridgewood had a policy of depriving Democrats of their rights to due process, free speech, freedom of assembly, freedom to be secure in their persons without unreasonable searches and seizures, and by preventing Democrats from supporting or advocating a candidate. Aside from those bare allegations, the plaintiff simply offers no proof whatsoever to support the allegation that there was a municipal policy in Ridgewood to suppress the beliefs of Democrats. Such a policy cannot be inferred from plaintiff's arrest itself. This is particularly so when one considers the fact that plaintiff was the only person among 15-20 Democratic, pro-Clinton supporters to be arrested.
As to the remainder of plaintiff's claims which essentially contend that Chief Mader created policy through his discussion with Palatucci on the morning of the rally on how to handle criminal complaints, as well as his claim of inadequate training, in-depth discussion is required. Despite Ridgewood's contention, both issues were raised by plaintiff prior to the summary judgment decision.

A.
Plaintiff alleges that the conversation between Chief Mader and Palatucci constituted the development of a municipal policy, through Chief Mader, by which officers at the rally would handle criminal complaints. It is alleged by plaintiff that the policy established by Chief Mader was that so long as the person filing the complaint possessed a copy of the lease, Chief Mader would order the person to be arrested.
It is conceded by the defense that Mader was a policymaking official in Ridgewood. This fact, alone, however, is not enough for a "single decision" by that official to create municipal policy. As the Court expressly recognized in Pembaur,
The fact that a particular officialeven a policymaking officialhas discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course whether an official had final policymaking authority is a question of state law.

[475 U.S. at 481-83, 106 S.Ct. at 1299-1300, 89 L.Ed.2d at 464-65 (Brennan, J.) (plurality opinion).][4] *592 While this particular point in Pembaur only garnered support from a plurality of the Court, later decisions of the Court have recognized this principle as a requisite for the imposition of municipal liability. See, e.g., Board of County Comm'rs v. Brown, 520 U.S. 397, ___, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626, 639 (1997); Jett v. Dallas Ind. School Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598, 627-28 (1989).
Thus, even though Chief Mader was a policymaking official in Ridgewood, this does not mean that he had the authority to implement the policy relevant to plaintiff's claim. While it is true that case law has recognized that a police chief, under certain circumstances, is the final authority representing official police policy, see Black v. Stephens, 662 F.2d 181, 191 (3d Cir.1981), plaintiff fails to address the fact that the Bergen County Prosecutor in this case established a police procedure to effect the arrest of trespassers. It has long been recognized in this state, under both our statutory and case law, that the county prosecutor is the foremost representative of the executive branch of government in law enforcement in his county and is responsible for local law enforcement authorities functioning within his county. State v. Winne, 12 N.J. 152, 96 A.2d 63 (1953); see also N.J.S.A. 2A:158-5. As the Winne Court observed:
It is a matter of common knowledge that the local law enforcement authorities from the chanceman on his beat to the chief of police and beyond him to the director of public safety are responsive to the county prosecutor's concept of law enforcement on pain of possible indictment if they do not cooperate with him in enforcing the law.

[Id. at 168, 96 A.2d 63.]
That is not to say that the municipality has no authority over the Chief of Police, or that he, in turn, has no authority to make policy. As both Winne and Pembaur acknowledge, policymaking functions may be separate or shared when it comes to law enforcement. Winne, supra, 12 N.J. at 168, 96 A.2d 63; Pembaur, supra, 475 U.S. at 484, 106 S.Ct. at 1301, 89 L.Ed.2d at 466. The point to be made, however, is that the inquiry must be sharply focused to determine what function exercised by the Chief of Police in this case caused the violation of plaintiff's constitutional rights, and who had the ultimate policymaking power with respect to that function. In this case, the Chief of Police was exercising the power of arrest without a warrant for a disorderly persons violation. See N.J.S.A. 2C:18-3. The critical question to be answered is whether Chief Mader had the ultimate policymaking authority with respect to that determination so as to have made it on behalf of Ridgewood.
Municipal authority to hire a Chief of Police is conferred by statute. N.J.S.A. 40A:14-118. When that authority is exercised, the Chief of Police "shall be the head of the police force and ... shall be directly responsible to the appropriate authority for the efficiency and routine day to day operations thereof." Ibid. In that context, the Chief of Police has the power to "enforce rules and regulations ... for the disposition and discipline of the force; ... [p]rescribe the duties and assignments of all subordinates...; [d]elegate ... authority as he may deem necessary for the efficient operation of the force to be exercised under his direction and supervision; and ... [r]eport at least monthly to the appropriate authority in such form as shall be prescribed by such authority on the operation of the force during the preceding month." N.J.S.A. 40A:14-118(a), (c), (d) and (e). The Chief of Police may also exercise the same police power as his subordinate officers. N.J.S.A. 40A:14-118(b).
While this statute serves to "avoid undue interference by a governing body into the operation of the police force," it also serves to define the sphere of the municipality's power in matters concerning the police department and the Chief of Police. Falcone v. De Furia, 103 N.J. 219, 222, 510 A.2d 1174 (1986). To the extent that Chief Mader had policymaking authority sufficient to bind Ridgewood, his authority in that respect could not be greater than Ridgewood's. And as to Ridgewood's authority, there is nothing in the provisions of the forgoing statute suggesting, no less specifically stating, that the municipality has the authority to make law enforcement policy with respect to effecting *593 arrests, obtaining search warrants, or the like. That power resides in the prosecutor pursuant to statute and case law. N.J.S.A. 2A:158-5; State v. Winne, supra. So important is the prosecutor's role in law enforcement that, even where the municipality is exercising its control over the Chief of Police under the statute, the prosecutor's "interest in the relationship between the governing body and the Chief of Police" is of sufficient importance to give the prosecutor standing in litigation between the Chief and the municipality. Falcone, supra, 103 N.J. at 226, 510 A.2d 1174.
Indeed, at oral argument before us, plaintiff acknowledged that Ridgewood could not effectuate a law enforcement policy that was contrary to a policy established by the Bergen County Prosecutor. Thus, it is no wonder that, in answers to interrogatories propounded by plaintiff inquiring as to policies in effect at the time of the incident, Chief Mader referred plaintiff to the "Law Enforcement Policies and Procedural Manual" maintained by the Bergen County Prosecutor's Office. Specifically, Ridgewood provided a copy of an excerpt from the Bergen County Manual entitled, "Commentary, A. Arrests; B. Warrantless Searches; 1. Warrant Not Required for an Arrest in a Public Place." That excerpt provides, in part:
A police officer has authority to arrest a suspect in a public place without a warrant if he has probable cause to believe that the suspect has committed a crime (a common law felony), even if the crime was not committed in his presence.... By this standard, crimes under the New Jersey Code of Criminal Justice of the first, second, third and fourth degrees are the equivalent of "felonies," while disorderly persons and motor vehicle offenses are not.... If the offense committed by the suspect is only a disorderly persons or a motor vehicle offense, then, unless it is committed in the officer's presence or admitted to by the suspect, an arrest may not be made without a warrant. (emphasis added)
Also included with this excerpt was a copy of N.J.S.A. 2C:18-3, stating that unless a trespass is committed in a dwelling, which would be a fourth degree crime, the crime is a disorderly persons offense.
Thus, to the extent that the policy for arresting trespassers is set forth in a manual promulgated by the Bergen County Prosecutor regarding law enforcement policies and procedures, and our State law clearly holds that municipal authority is inferior to that of the county prosecutor in such matters, see Winne, supra, Ridgewood did not have any policymaking authority in the context of this case. Therefore, Chief Mader could not have been acting for Ridgewood in that respect.
Based on our review of the record, there is no indication that Chief Mader ever discussed with Palatucci the manner in which these persons would be dealt with once a complaint was filed. Furthermore, even if he did, as noted above, in light of the fact that there was a county policy in effect regarding how persons charged with disorderly persons offenses would be handled, neither he nor Ridgewood had the "final" policymaking authority with respect to such procedure. Pembaur, supra, 475 U.S. at 483, 106 S.Ct. at 1300, 89 L.Ed.2d at 465. Thus, the only issue that may have arisen from the conversation between Chief Mader and Palatucci, and Chief Mader's subsequent action in arresting the plaintiff, is whether Chief Mader wilfully or negligently misapplied then-existing county policy on how to handle a criminal complaint for a disorderly persons violation. This is an issue, however, that relates to Chief Mader's individual liability, not the municipality's.
Because the plaintiff has failed to establish a municipal policy in this regard, his reliance on Pembaur, supra, Black v. Stephens, supra, and Bartholomew v. Fischl, 782 F.2d 1148 (3d Cir.1986) is misplaced. In those decisions, the local governmental policymaking official had "final policymaking authority" with regard to the particular action that subjected the plaintiff to constitutional injury. For example, in Pembaur it was determined that the county prosecutor was in fact the final policymaking official with regard to the manner and procedure that officials were to follow in effecting arrests. 475 U.S. at 484-85, 106 S.Ct. at 1300-01, 89 L.Ed.2d at 465-66. Similarly, in Bartholomew the plaintiff *594 brought an action against the City of Allentown for his unlawful termination. In reversing a dismissal of the plaintiff's complaint, the Third Circuit found that Fischl, among other Allentown officials, was a municipal policymaking official with the authority to terminate the plaintiff's position. 782 F.2d at 1152-53. Thus, because plaintiff's position was terminated by allegedly unlawful motivations of Fischl and others, plaintiff had established a municipal policy that could give rise to municipal liability. Ibid. Likewise, in Black it was established that the chief of police represented official policy concerning disciplinary matters which proximately caused the plaintiff's injuries in that case. 662 F.2d at 191 (emphasis added); cf. N.J.S.A. 40A:14-118(a). Unlike these cases, the plaintiff here, while establishing that Chief Mader had a limited policymaking role, has not demonstrated that Chief Mader had any final policymaking authority with regard to plaintiff's alleged constitutional injuries.

B.
Plaintiff argues in the alternative that Ridgewood failed to adequately train its officers to safeguard the interests of Democrats in Ridgewood. According to the plaintiff, "[a] (Ridgewood) official had to know and to have anticipated that at least some persons that were Democrats, not Republicans,... were going to avail themselves of the opportunity to attend the rally and express their ideas and principles in a peaceful manner." It is plaintiff's contention that it was Ridgewood's failure to train its officers to safeguard the constitutional rights of Democrats that caused him harm.
In City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court set forth the standard upon which courts should analyze "failure to train" claims. There, the Court was reviewing a claim that the inadequate training of prison officials led to a violation of a detainee's constitutional rights. In setting forth the standard, the Court specifically held that mere negligence on the part of the official would not suffice; rather, a plaintiff trying to establish municipal liability on this basis must show that the municipal action taken, either officially adopted by the governing body or through a policymaking official, was with "deliberate indifference" to the action's known or obvious consequences. Id. at 388, 109 S.Ct. at 1204, 103 L.Ed.2d at 426. Recognizing that a "failure to provide proper training may fairly be said to represent a policy for which the city is responsible," the Court noted that such a claim will only be tenable in the "limited circumstances" where "deliberate indifference" is proven. Id. at 387-91, 109 S.Ct. at 1204-06, 103 L.Ed.2d at 425-28. The fact that a program is negligently administered or that an officer makes a mistake is not enough to establish municipal liability. Id. at 391, 109 S.Ct. at 1206, 103 L.Ed.2d at 428.
In its recent decision in Board of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Court, in analyzing the decision in Canton, explained that "`deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. at ___, 117 S.Ct. at 1391, 137 L.Ed.2d at 643. Again reiterating the limited nature of this cause of action, the Court stated that, "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations preventing an obvious potential for such a violation, could trigger municipal liability." Id. at ___, 117 S.Ct. at 1391, 137 L.Ed.2d at 642 (emphasis added). Thus, to state a cause of action under § 1983 on a failure to train theory, a plaintiff must show that, prior to the alleged injury, the municipality, through its policymaking official in charge of training, was put on notice of the likelihood of injury. Id. at ___, 117 S.Ct. at 1390, 137 L.Ed.2d at 643.
In the present case, the plaintiff has failed to meet this stringent burden of proof. Although it is conceded that Chief Mader, as Chief of the Ridgewood Police Department, is a municipal policymaker and, assuming for the sake of discussion, that he was the official responsible for making policy with regard to police training, there is nothing in the record from which the court can impute prior knowledge *595 or deliberate indifference to plaintiff's rights. While plaintiff makes the broad accusation that Ridgewood is "Republican country" and that "Democrats have to walk gingerly along Republican streets," plaintiff fails to point to one incident in which Democrats were the target of official misconduct. Plaintiff's allegation that the mere fact that there was a Republican rally should have put Chief Mader on notice to train officers to safeguard the constitutional rights of Democrats hardly meets the stringent requirements of Canton and Brown.
Furthermore, not only does plaintiff fail to demonstrate that Ridgewood was on notice of potential injury, but also plaintiff has failed to adduce evidence showing that the alleged inadequacies in the police training resulted from a conscious choice, or, in other words, a "deliberate indifference" to the rights of Democrats. As Justice Brennan noted in Pembaur, supra, the type of "policy" which gives rise to municipal liability under § 1983 is where a "deliberate choice to follow a course of action is made from among various alternatives." 475 U.S. at 483, 106 S.Ct. at 1300, 89 L.Ed.2d at 465. Plaintiff has simply offered no basis to support the conclusion that Mader, as Ridgewood's policymaker with regard to police training, had an intent to suppress the views of Democrats.

III.

PLAINTIFF'S § 1985(3) CLAIM
42 U.S.C. § 1985(3) provide that:
If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
Plaintiff here alleges that Judge Doyne improperly granted Ridgewood's motion for summary judgment on the § 1985(3) count, alleging that he satisfied the requirements of a claim under both the first and third clauses of § 1985(3).
As Judge Doyne recognized, there is no need to analyze the particulars of plaintiff's § 1985(3) claim, because, as noted above, the plaintiff has failed to establish that a municipal "policy" subjected him to constitutional injury. As the Third Circuit recognized in Mody v. City of Hoboken, 959 F.2d 461, 466 (3d Cir.1992), the success of both a § 1983 action and a § 1985(3) action requires the plaintiff to prove causation between a discriminatory municipal policy and the alleged injury. Thus, the plaintiff's failure to demonstrate a municipal policy in the first instance bars his recovery under both § 1983 and § 1985(3).
Affirmed.
NOTES
[1] All defendants, except Ridgewood, settled with plaintiff and do not participate in this appeal. Accordingly, we focus only on the issues regarding Ridgewood.
[2] It is alleged by the plaintiff that the time in which he was kept in custody coincides with the time that President Bush addressed the crowd.
[3] "A capias is a writ of attachment commanding a county official to bring a subpoenaed witness who has failed to appear before the court to testify and answer for civil contempt." Id. at 472 n. 1, 106 S.Ct. at 1294 n. 1, 89 L.Ed.2d at 458 n. 1.
[4] With respect to Justice Brennan's opinion for the Court, only Justices White, Marshall and Blackmun joined on this point.