NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0629-23
                A-1209-23

MIRZA M. BULUR, in his official
capacity as the Acting Public Safety
Director for the CITY OF PATERSON
and Appropriate Authority, CITY OF
PATERSON POLICE DEPARTMENT,
and ENGELBERT RIBEIRO, in his
official capacity as the Police Chief of
the CITY OF PATERSON POLICE
DEPARTMENT,

       Plaintiffs-Appellants,

v.

THE NEW JERSEY OFFICE OF THE
ATTORNEY GENERAL, MATTHEW J.
PLATKIN in his official capacity as
Attorney General of the STATE OF NEW
JERSEY,

       Defendants-Respondents.

_____

ANDRE SAYEGH, in his official capacity
as the Mayor of the CITY OF PATERSON,
and ENGELBERT RIBEIRO, in his official
capacity as the Police Chief of the CITY
OF PATERSON POLICE DEPARTMENT,

       Plaintiffs-Appellants,

v.

<table>
<tr><td><b>APPROVED FOR PUBLICATION</b></td></tr>
<tr><td align="center"><b>December 18, 2024</b></td></tr>
<tr><td align="center"><b>APPELLATE DIVISION</b></td></tr>
</table>

ISA M. ABBASSI, in his official capacity
as Officer-in-Charge of the PATERSON
POLICE DEPARTMENT, THE NEW
JERSEY OFFICE OF THE ATTORNEY
GENERAL, and MATTHEW J. PLATKIN,
in his official capacity as the Attorney
General of the STATE OF NEW JERSEY,

     Defendants-Respondents.

_____

Argued September 24, 2024 – Decided December 18, 2024

Before Judges Smith, Chase and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket Nos. L-2736-23 and L-3290-23.

Christopher J. Gramiccioni argued the cause for appellants Mirza M. Bulur and Engelbert Ribeiro (Kingston Coventry, LLC, attorneys; Christopher J. Gramiccioni, on the joint briefs).

Edward J. Florio argued the cause for appellant André Sayegh (Florio Kenny Raval, LLP, attorneys; Edward J. Florio and Christopher K. Harriott, on the joint briefs).

Michael Zuckerman, Deputy Solicitor General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, and Michael L. Zuckerman, of counsel and on the briefs; Robert J. McGuire, Liza B. Fleming, Sidney E. Goldstein, Elizabeth H. Micheletti, Stephanie M. Mignogna, and Michael R. Sarno, Deputy Attorneys General, on the briefs).

2

Vito A. Gagliardi, Jr., argued the cause for amicus curiae New Jersey State Association of Chiefs of Police (Porzio, Bromberg & Newman, PC, attorneys; Vito A. Gagliardi, Jr., of counsel; David L. Disler and Thomas J. Reilly, on the brief).

Frank G. Marshall, Jr., argued the cause for amicus curiae New Jersey State League of Municipalities (Frank G. Marshall, Jr., on the brief).

The opinion of the court was delivered by

SMITH, J.A.D.

Soon after a tragic incident in Paterson concerning an officer-involved shooting, the Attorney General (AG) directly superseded, or took over, the entire Paterson Police Department (PPD), without the consent of city officials. The AG removed the acting police chief and reassigned him to a position at the Police Training Commission (PTC). In the chief's place, the AG appointed an Officer-in-Charge (OIC) to manage the day-to-day administration and operation of the department. Plaintiffs challenged the AG's supersession in two lawsuits, asserting the AG's actions in taking over the department and unilaterally removing the duly appointed chief of police were ultra vires.

This administrative appeal presents us with a question of first impression: Does the AG have the authority to directly supersede all operations of a municipal police department without the consent of the municipality?

After a review of the Criminal Justice Act of 1970, N.J.S.A. 52:17B-97 to -117, as well as other relevant statutes and jurisprudence, we conclude the answer is no. We reverse the AG's supersession of March 27, 2023, and direct defendants to reassign the police chief to Paterson from the PTC and restore day-to-day operational control of the PPD to plaintiffs for the reasons which follow.

I.

On March 27, 2023, the AG, Matthew J. Platkin,[1] directed the Office of the Attorney General (OAG) to assume full operational control of the PPD's day-to-day operations. The AG justified the takeover of the department by citing to, among other things, "the loss of faith in the leadership of the Department, longstanding fiscal challenges, and mounting public safety concerns in the City of Paterson." The AG gave written notice of the takeover, described as a supersession, to Paterson Mayor André Sayegh, Paterson Police Chief Engelbert Ribeiro, and other officials. In the letter, the AG cited the OAG's legal authority to carry out the supersession. It stated:

> The authority for the Attorney General or a County Prosecutor to supersede a police department is derived from the Criminal Justice Act of 1970, N.J.S.A. 52:17B-97 to -117, and N.J.S.A. 2A:158-4 and -5.

---

[1] Matthew J. Platkin became the AG of the State of New Jersey on February 14, 2022, and has been the AG at all relevant times throughout this litigation.

This authority is also consistent with both decades of practice by the Attorney General and County Prosecutors, as well as a substantial body of case law recognizing the Attorney General's role in overseeing law enforcement agencies as the chief law enforcement officer in the State and the County Prosecutor as the chief law enforcement officer in the county. See, e.g., State v. Winne, 12 N.J. 152 (1953); Williams v. Borough of Clayton, 442 N.J. Super. 583 (App. Div. 2015); Constantine v. Twp. of Bass River, 406 N.J. Super. 305, 327 (App. Div. 2009); State v. Ward, 303 N.J. Super. 47, 52-58 (App. Div. 1997); State v. Downie, 229 N.J. Super. 207, 209 n.1 (App. Div. 1988), aff'd, 117 N.J. 450, certif. denied, 498 U.S. 819 (1990); Kershenblatt v. Kozmor, 264 N.J. Super. 432, 435-38 (Law Div. 1993). (citations reformatted).

That same day, the AG made personnel changes within the police department, including replacing Chief Ribeiro with an interim Officer-in-Charge (OIC), New Jersey State Police Major Frederick Fife.

On May 2, 2023, the OAG reassigned Chief Ribeiro to the PTC, which is located at the Division of Criminal Justice (DCJ) in Trenton. Paterson opposed Ribeiro's reassignment and proposed that the OAG assign the chief to City Hall for the duration of the supersession. The OAG rejected the proposal. Instead, the OAG reduced the transfer to writing, using a memorandum of understanding (MOU) jointly signed with the police department. Major Fife signed the MOU on behalf of Paterson and its police department. The AG

5

replaced Major Fife with Isa M. Abbassi as Officer-In-Charge of the PPD on May 9, 2023.

While serving in his PTC assignment, Chief Ribeiro was subject to supervision by the DCJ but remained a paid employee of Paterson.

On the day Chief Ribeiro's PTC assignment was to expire, November 15, 2023, Mayor Sayegh instructed him to report to City Hall the next day. At the same time, the OAG extended Chief Ribeiro's PTC assignment by six months. Via email, OIC Abbassi directed Ribeiro to report to the PTC over the Mayor's objections, and Ribeiro complied. Fife, on behalf of the PPD, and the OAG, have continued to renew the MOU and it remains in place.

The October 6 Complaint

On October 6, 2023, Public Safety Director Mirza Bulur and Chief Ribeiro filed a verified complaint in the Law Division pursuant to the Uniform Declaratory Judgments Act (UDJA), N.J.S.A. 2A:16-50 to -62. They named as defendants the AG, the OAG, and various fictitious entities. Contending that defendants' supersession of the police department was ultra vires, plaintiffs sought declaratory and injunctive relief: declaring that defendants had exceeded their constitutional and statutory authority by taking over the entire department; declaring that Paterson's statutory powers to control the daily administration and operation of its police department had been usurped by

6                                                                                      A-0629-23

defendants' actions; terminating defendants' command and control of the department; restoring and recognizing Chief Ribeiro "as the duly appointed and qualified chief of the [police department]"; returning operational control of the police department to the city; compelling defendants to provide the city with a month-by-month accounting of the department's operations while under the control of the OAG and the OIC; barring defendants' staff from use and occupancy of space in the Paterson Public Safety building; and limiting defendants' supersession authority over the PPD to its internal affairs unit. Over plaintiffs' objection, the trial court issued an order transferring venue to us on October 23.

The November 28 Complaint

On November 28, 2023, Chief Ribeiro and Mayor Sayegh filed a second complaint against defendants pursuant to the UDJA. Alleging defendants had no authority to enter into a binding agreement on behalf of the city or the police department, plaintiffs sought an order granting declaratory and injunctive relief declaring: that Chief Ribeiro is not subordinate to OIC Abbassi, nor required to report to him; that Chief Ribeiro's assignment to the PTC was ultra vires; that Mayor Sayegh retained supervisory authority over Chief Ribeiro; and that defendants be barred from disciplining Ribeiro. On

7

December 8 the trial court consolidated the two complaints and transferred the entire matter to us.

On appeal, plaintiffs renew their argument that defendants' supersession was ultra vires. Mayor Sayegh, Chief Ribeiro, and Director Bulur contend that neither statutory authority nor relevant case law support the supersession of the entire PPD. Plaintiffs further argue that the New Jersey Legislature has expressly granted municipalities like Paterson the authority to manage and operate their own police departments, except for internal affairs. Plaintiffs also contend the AG did not have the authority to appoint OIC Abbassi to supervise all Paterson police operations. Plaintiffs submit that as a result of defendant's ultra vires actions, they are entitled to injunctive relief: ending defendants' plenary supersession of the PPD and their occupancy of the Paterson Public Safety Department; limiting defendants' supersession to the police department's internal affairs functions; returning control of the police department to Director Bulur and Chief Ribeiro; and requiring the OAG to produce reports regarding the operation of the police department.

## II.

The State Constitution provides for judicial review of administrative agency action. N.J. Const. art. VI, § 5, ¶ 4. An agency action "will be sustained unless there is a clear showing that it is arbitrary, capricious, or

A-0629-23

unreasonable, or that it lacks fair support in the record." In re Proposed Constr. of Compressor Station (CS327), 258 N.J. 312, 324 (2024) (citing Mount v. Bd. of Tr., PFRS, 233 N.J. 402, 418 (2018) (quoting Russo v. Bd. of Tr., PFRS, 206 N.J. 14, 27 (2011))).

> To assess whether an agency decision is arbitrary, capricious, or unreasonable, a court must examine: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Ambroise, 258 N.J. 180, 197–98 (2024)
> (citing In re Carter, 191 N.J. 474, 482 (2007)).]

However, when an agency interprets a statute or case law, a court will review that interpretation under a de novo standard of review. In re Proposed Constr. of Compressor Station (CS327), 258 N.J. at 324 (quoting Russo, 206 N.J. at 27).

Using these principles as a guide, we proceed with a de novo review of defendants' administrative actions.

## III.

### A.

Rule 2:4-1(b) and Defendants' Timeliness Arguments

As a threshold matter, defendants argue plaintiffs' challenge to the OAG's supersession is untimely. Defendants give two reasons for their argument: plaintiffs failed to comply with the forty-five-day deadline to challenge final administrative decisions under Rule 2:4-1(b); and plaintiffs' appeal is barred by laches.

Defendants' Rule 2:4-1(b) argument raises three questions: Were the actions of the AG and the OAG administrative decisions? If so, were these decisions final? If these decisions were final, are plaintiffs' challenges barred by timeliness considerations?

We first consider whether defendants' actions were administrative decisions, and if so, what type. We note that:

> Most administrative agencies perform two delegated functions: they have the power to make rules that can have the effect of laws -- a quasi-legislative role -- and the power to adjudicate individual cases -- a quasi-judicial role. See Jacob A. Stein et al., 4 Administrative Law § 14.01 (2021); accord Nw. Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 135 (2001); see also In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 386 (2013) (citing examples); Jeffrey S. Mandel, N.J. Appellate Practice, 38:1-2 (2021) (distinguishing types of administrative action). "The line between the[] two functions," however, "is not always a clear one." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 770 (1969) (Black, J., concurring); accord Metromedia, Inc. v. Dir., Div. of Tax'n, 97 N.J. 313, 332 (1984); Carls v. Civ. Serv. Comm'n, 17 N.J. 215, 220 (1955). Agencies can also act in a hybrid manner,

> with features of rulemaking and adjudication, or in an informal fashion, without a hearing. Nw. Covenant Med. Ctr., 167 N.J. at 136-37.
>
> [In re Att'y Gen. L. Enf't, 246 N.J. 462, 490 (2021) (alterations in original).]

Defendants' supersession of the entire police department and reassignment of Chief Ribeiro contains both quasi-legislative and quasi-judicial elements. Their actions "reflect[] an administrative policy" that "was not previously expressed in any official and explicit agency determination" and "a decision on administrative regulatory policy in the nature of the interpretation of law . . . ." Columbia Fruit Farms, Inc. v. Dep't of Cmty. Affs., 470 N.J. Super. 25, 39 (App. Div. 2021) (quoting Metromedia, Inc., 97 N.J. at 331-32).

We first identify the AG's quasi-legislative acts. In March 2023, defendants assumed plenary control of the administration and operation of the PPD, including installing new management by appointing an OIC. Defendants had not previously taken such unilateral action against the city's entire police force.[2] In support of the supersession, defendants cite the Criminal Justice Act

---

[2] The record shows on April 27, 2021, then AG Grewal and Passaic County Prosecutor Camelia Valdes announced in tandem that the Passaic County Prosecutor's Office would assume responsibility for the Internal Affairs of the PPD. The Passaic County Prosecutor's Office had "full oversight" and was solely "responsible for investigating" the PPD.

11

of 1970, N.J.S.A. 52:17B-97 to -117, N.J.S.A. 2A:158-4 and -5, as well as relevant caselaw. The AG then interpreted the statutes and precedent to authorize supersession of Paterson's entire police department. Defendants' actions in this instance are quasi-legislative in nature, and they reflect the OAG's rulemaking function. It follows that plaintiffs' challenge to this aspect of defendants' actions are not governed by the forty-five-day rule.

We next assess defendants' quasi-judicial acts.

> When determining whether an agency decision is a quasi-judicial act, "[t]he crucial question[] [is] whether the fact finding involves a certain person or persons whose rights will be directly affected." Cunningham v. Dep't of Civ. Serv., 69 N.J. 13, 22 (1975). Indeed, agencies engaged in quasi-judicial decision-making must "consider evidence and apply the law to facts as found, thereby exercising a discretion or judgment judicial in nature on evidentiary facts." Handlon v. Town of Belleville, 4 N.J. 99, 105 (1950). "The nature of the factual inquiries may be dispositive or assist in the disposition of the issue." Cunningham, 69 N.J. at 22.
>
> [Nw. Covenant Med. Ctr., 167 N.J. at 136 (alterations in original) (citations reformatted).]

The OAG's reassignment of Chief Ribeiro and OIC Abbassi's unilateral execution of the MOU on November 15 represent agency decisions involving a person "whose rights will be directly affected." Ibid. These two decisions represent quasi-judicial actions, which, if final, are subject to the forty-five-day rule. Id. at 135.

12

We only review the "final action of the agency." N.J.S.A. 52:14B-12; R. 2:2-3(a)(2). The agency decision must convey "unmistakable notice of its finality." In re CAFRA Permit No. 87-0959-5, 152 N.J. 287, 299 (1997). While defendants' actions were not derived from formally entered judgments, the record shows they gave clear and unambiguous notice to city officials and residents alike that their decisions were final. The AG first communicated supersession of the entire police department to the mayor by letter dated March 27, 2023.

The opening paragraph of the AG's letter states:

> I write to provide you with notice that I am exercising the supersession authority of my position, and the Office of the Attorney General ("OAG") has assumed responsibility for the day-to-day operations of the Paterson Police Department, inclusive of its Internal Affairs function. I have appointed Isa Abbassi to serve as the Officer-in-Charge ("OIC") effective at a date to be determined in May of this year. Effective immediately, and until such time as OIC Abbassi assumes command of the police department, I have named Major Fred Fife of the New Jersey State Police as the Interim OIC. He and other members of the OAG staff will be temporarily assigned to Paterson to work with current members of the Paterson Police Department to ensure that there is a continuity of police services in the City.

The AG's March 27 letter communicates unmistakable notice of finality to Mayor Sayegh. First, the letter plainly states that the OAG immediately assumed daily operational responsibility for the city's police department.

Second, the letter clearly describes the scope of the takeover, informing the mayor that defendants assumed responsibility for the entire police department, including Internal Affairs. These elements of the letter, along with the AG's notice that an OIC would assume command of the police department, represent the "consummation of the agency's decision[-]making process." In re Application for a Rental Increase at Zion Towers Apts. (HMFA #2), 344 N.J. Super. 530, 535 (App. Div. 2001) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)).

Plaintiffs' second complaint challenged what they alleged was a unilateral extension of Chief Ribeiro's PTC assignment. They allege that, without their assent, Abbassi executed an MOU between the department and the OAG extending Ribeiro's assignment at the PTC from November 15, 2023, through May 15, 2024. The record demonstrates the finality of defendants' personnel action, as they exercised control over a Paterson Police Department employee, Chief Ribeiro, and re-assigned him to the PTC in Trenton.

On the threshold question of timeliness, we note that Rule 2:4-1(b)[3] applies to quasi-judicial actions. In re Rodriquez, 423 N.J. Super. 440, 447

---

[3] Rule 2:4-1(b) states: "Appeals from final decisions or actions of state administrative agencies or officers . . . shall be filed within 45 days from the date of service of the decision or notice of the action taken."

(App. Div. 2011). It does <u>not</u> apply to the quasi-legislative actions of an administrative agency. <u>See</u> <u>Nw. Covenant Med. Ctr.</u>, 167 N.J. at 135; <u>Bergen Pines Cnty. Hosp. v. N.J. Dep't of Hum. Servs.</u>, 96 N.J. 456, 471 n.10 (1984); <u>N.J. Hospice & Palliative Care Org. v. Guhl</u>, 414 N.J. Super. 42, 49-50 (App. Div. 2010) (citing Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 3.1 on <u>R.</u> 2:4-1(b) (2010)); <u>In re Six Month Extension of N.J.A.C. 5:91-1</u>, 372 N.J. Super. 61, 87 (App. Div. 2004), <u>certif. denied</u>, 182 N.J. 630 (2005).

We examine plaintiffs' two complaints and determine which theories are bound by <u>Rule</u> 2:4-1(b), or the forty-five-day rule, and which are not.

Count I of the October 6, 2023 complaint[4] alleges that defendants violated plaintiffs' rights under Article IV, section 7, paragraph 11 of the New Jersey Constitution[5] and the New Jersey Home Rule Act[6] by their ultra vires supersession of the city police department. Count II alleges defendants improperly relied upon N.J.S.A. 52:17B-98 and N.J.S.A. 52:17B-107 to

---

[4] Docket No. A-0629-23.

[5] <u>N.J. Const.</u> art. IV, § 7, ¶ 11 states: "The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law.

[6] N.J.S.A. 40:49-27.

supersede the day-to-day operations of the police department. Counts I and II each contest the quasi-legislative supersession of the city's entire police department. It follows that these counts are not subject to the forty-five-day rule.

Count III contests Chief Ribeiro's reassignment to the PTC. It squarely implicates "[t]he crucial question[]" of how and whether defendants' supersession affected his right to hold the title and carry out the duties of the position of Paterson Chief of Police. Cunningham, 69 N.J. at 22. Because Count III appeals defendants' quasi-judicial decision, we conclude this claim is barred by the forty-five day rule.

Counts IV, V, and VII challenge certain unilateral actions of defendants which, plaintiffs allege, have adversely impacted the city's ability to manage its police department. These actions include: failure to generate monthly reports in violation of N.J.S.A. 40A:14-118(e); appointment of an OIC who was not a New Jersey licensed police officer to replace Chief Ribeiro; and the "commandeering" of Chief Ribeiro's police department office without paying remuneration to the city. As the United States Supreme Court has pointed out, the lines between an agency's quasi-legislative and quasi-judicial functions are not always clear. Wyman-Gordon Co., 394 U.S. at 770. Here, defendants' actions appear hybrid in nature because of the supersession's impact on Chief

16

Ribeiro's reporting role pursuant to N.J.S.A. 40A:14-118(e), his ouster from the chief's office, and the qualification status of his state-appointed successor. See Nw. Covenant Med. Ctr., 167 N.J. at 136-37. However, a closer look reveals the complained of agency action contains more rulemaking than adjudication. In each instance, defendants took unilateral action which did not require adjudication of any individual Paterson police officer's rights, including Chief Ribeiro. That said, the sum of plaintiffs' allegations is that police operations were materially affected by what they contend were defendants' ultra vires actions. We conclude Counts IV, V, and VII are, on balance, quasi-legislative in nature and not subject to Rule 2:4-1(b).

Counts VI and VIII allege that defendants violated several statutes in removing Chief Ribeiro, who was lawfully appointed to his position by Paterson's governing body, including removing Ribeiro without cause under N.J.S.A. 40A:14-7, and unilaterally signing an agreement with the PTC to transfer him. These actions clearly affected Chief Ribeiro's reassignment to the PTC, and like Count III, adversely impacted his right to serve as police chief. Defendants' actions were quasi-judicial, and the forty-five-day rule applies to Counts VI and VIII.

17

We use this legal framework to review the November 28 complaint.[7] Plaintiffs filed the complaint fourteen days after defendants unilaterally executed the MOU between the police department and the PTC which extended Ribeiro's transfer and ongoing assignment for six months.

Counts I through III are adjudicative in nature, and timely under Rule 2:4-1(b). Count IV is quasi-legislative in nature and, therefore, not governed by the rule. Given plaintiffs' promptness in filing their second complaint, we conclude all four counts of the November 28 complaint survive defendants' timeliness defenses.

We next analyze whether laches bars Counts I, II, VI, and VIII of plaintiffs' October 6 complaint. Quasi-legislative actions are governed by principles of laches, not Rule 2:4-1(b). Nw. Covenant Med. Ctr., 167 N.J. at 134-35. Laches is "an equitable defense that may be interposed in the absence of the statute of limitations . . . and has been defined as an 'inexcusable delay in asserting a right.'" Id. at 140 (quoting City of Atlantic City v. Civil Serv. Comm'n, 3 N.J. Super. 57, 60 (App. Div. 1949)). However, "laches involves more than mere delay [or] mere lapse of time. There must be delay for a length of time which, unexplained and unexcused, is unreasonable under the circumstances and has been prejudicial to the other party." Ibid. (quoting W.

---

[7] Docket No. A-1209-23.

Jersey Title & Guar. Co. v. Indust. Tr. Co., 27 N.J. 144, 153 (1958)). The Court noted, "[t]he primary factor to consider when deciding whether to apply laches is whether there has been a general change in position during the time that has made it inequitable to allow the claim to proceed." Id. at 141.

The record shows that plaintiffs filed their first complaint approximately six months after the supersession. We conclude that, on this record, a six month and ten-day delay from supersession to plaintiffs' filing of a complaint is not unreasonable under the totality of the circumstances, which include the sweeping nature of the supersession and its consequences for Paterson police operations.

Advancing their laches defense, defendants contend they are prejudiced by plaintiffs' delay in filing the first complaint. Defendants insist the prejudice is financial, arguing that they invested millions of dollars on Paterson public safety initiatives that they may not have spent but for the supersession.[8] We

---

[8] The OAG states that they have invested over $1 million into the PPD, along with additional resources and time invested by officials across the Department of Law and Public Safety. The OAG also notes that they have implemented certain reforms intended to address public safety and enhance community engagement. The OAG estimates that it will commit over $10 million to fund police operations in Paterson though 2024.

are unpersuaded, and decline to consider defendants' public expenditures in Paterson as part of a laches analysis.[9]

Even if laches did apply, and we conclude it does not, we would hear this appeal on the merits "in view of the importance of the public question involved." Jacobs v. N.J. State Highway Auth., 54 N.J. 393, 396 (1969).

B.

The Attorney General's Supersession Authority

The parties agree that the dispositive question is: Does the AG have legislative or other authority to supersede an entire police department without consent of the municipality? We resolve the question by defining supersession, then reviewing relevant legislation, administrative actions, and case law concerning supersession.

i.

Definition of Supersession

Our first task is to define supersession. The terms "supersede," "superseded," and "supersession" appear in N.J.S.A. 52:17B-106 and -107, but

---

[9] We do not consider the State's expenditure of public funds after the supersession an appropriate factor in a laches analysis. Simply put, for purposes of determining laches, there cannot be prejudice to the State of New Jersey when it expends financial resources in service of its citizens' legitimate public safety needs. That said, were we to engage in such an analysis here, we would not consider defendants' public safety expenditures to be a prevailing factor and would find laches did not apply.

they are not defined by any statute or regulation. Where terms are not defined by statute or regulations, "we afford those terms their 'generally accepted meaning, according to the approved usage of the language.'" In re Proposed Constr. of Compressor Station (CS327), 258 N.J. at 328 (quoting N.J.S.A. 1:1-1). The dictionary definition of "supersession" is "the act of superseding" or "the state of being superseded." Merriam-Webster's Collegiate Dictionary 1255 (11th ed. 2020). The present tense of "superseding" and "superseded," is "supersede," which is defined as "to cause to be set aside," "to force out of use as inferior," "to take the place or position of," or "to displace in favor of another." Ibid. With these definitions in mind, we consider how the term has been used by the Legislature and by defendants.

N.J.S.A. 52:17B-106, titled "Supersedure of county prosecutor," states that:

> Whenever requested in writing by the Governor, the Attorney General shall, and whenever requested in writing by a grand jury or the board of [commissioners] of a county or the assignment judge of the superior court for the county, the Attorney General may supersede the county prosecutor for the purpose of prosecuting all of the criminal business of the State in said county. . . .
>
> [(Emphasis added).]

N.J.S.A. 52:17B-107(a)(1) states that the AG has the discretion to "supersede a county prosecutor in any investigation, criminal action or

proceeding" when, "in [their] opinion . . . the interests of the State will be furthered." (Emphasis added). Additionally, the AG "shall supersede" county prosecutors "for the purpose of conducting . . . any investigation, criminal action or proceeding" in all instances where a person has died in an encounter with, or in the custody of, a law enforcement officer. N.J.S.A. 52:17B-107(a)(2) (emphasis added).

Given the plain language of sections 106 and 107, we define the term "supersession" for purposes of this litigation as "the act of taking the place or position of."

We use these two sections, adopted in 1970, as a starting point to help us determine whether the Legislature granted defendants the authority to supersede the PPD.

ii.

Section 106 and 107 of the Criminal Justice Act

The Criminal Justice Act (CJA) authorizes the AG, upon written request of the Governor or select county officials, to conduct an unqualified and complete takeover of a county prosecutor's office, to prosecute "all of the criminal business . . . in [the] county." N.J.S.A. 52:17B-106; see, e.g., Yurick v. State, 184 N.J. 70, 74 (2005) (explaining the AG's supersession of the

22

Gloucester County Prosecutor's Office at the written request of Governor James E. McGreevey).

N.J.S.A. 52:17B-107(a)(1) and (2) somewhat narrows the Legislature's grant of authority to the AG to supersede a county prosecutor. Section 107(a)(1) grants discretionary supersession authority to the AG "in any investigation, criminal action or proceeding . . . ." Section 107(a)(2) requires the AG to supersede a county prosecutor where a person has died during or after an encounter with a law enforcement officer, or in custody, "for the purpose of conducting . . . any investigation, criminal action or proceeding concerning the incident."

As shown by sections 106 and 107's unambiguous language, the Legislature's grant of express supersession authority to the AG is quite clear, and it encompasses a spectrum of authority including complete supersession, discretionary limited supersession, and mandatory limited supersession. Sections 106 and 107 are silent concerning the AG's direct supersession of a municipal police department.

iii.

N.J.S.A. 40A:14-181

A-0629-23

In 1991, the OAG adopted guidelines regarding an internal affairs policy and procedures (IAPP) for municipal police departments.[10] Five years later, the Legislature incorporated those IAPP guidelines into the Law Enforcement Officers' Protection Act of 1996. L. 1996, c. 115. The legislation, among other things, required all law enforcement agencies in the state to "adopt and implement guidelines which shall be consistent with the guidelines governing the 'Internal Affairs Policy and Procedures' of the Police Management Manual promulgated by . . . the Division of Criminal Justice . . . ." L. 1996, c. 115, § 10 (codified at N.J.S.A. 40A:14-181). This language is the statute's sole reference to the 1991 IAPP. Unlike the express supersession authorization contained in the 1970 CJA, the Legislature omitted language authorizing AG supersession of all law enforcement agencies, including municipal police departments. Nonetheless, N.J.S.A. 40A:14-181 represents a plainly worded legislative mandate, directing all law enforcement agencies to adopt and implement the OAG's internal affairs guidelines.[11] Our state's law enforcement

_____

[10] Off. of the Att'y Gen., Internal Affairs Policy & Procedure (1991).

[11] The record shows that, in 2021, then Attorney General Gurbir S. Grewal and the Passaic County Prosecutor's Office (PCPO) jointly announced that the PCPO would "assume responsibility" for and have "full oversight" of the PPD Internal Affairs Division. The April 27, 2021, press release contained no reference to the term "supersession."

A-0629-23

agencies are, and remain, bound to follow the OAG's 1991 guidelines as mandated. N.J.S.A. 40A:14-181 operates as a grant of implied authority to the AG and the OAG to enforce compliance with the guidelines. Under this implied legislative authority, one enforcement tool available to the AG and the OAG is a limited supersession of "all law enforcement agencies" to enforce the internal affairs guidelines which the Legislature required them all to adopt.

While the CJA grants the AG clear and unequivocal authority to supersede county prosecutors, an expansive reading of N.J.S.A. 40A:14-181 is that it creates an implied legislative authority in the AG and the OAG to use supersession to enforce the OAG's internal affairs guidelines with all law enforcement agencies.

iv.

Directive No. 2022-14

In 2022, the OAG issued Law Enforcement Directive No. 2022-14. Off. of the Att'y Gen., Law Enf't Directive No. 2022-14, Transparency in Internal Affairs Investigations (Nov. 15, 2022). The AG stated that the directive was needed: "(1) to reduce uncertainty, delays, and litigation costs relating to records requests after Rivera;[12] (2) to promote transparency for the [substantiated] misconduct that is most likely to undermine public trust on a

---

[12] Rivera v. Union Cnty. Prosecutor's Office, 250 N.J. 124 (2022).

A-0629-23

uniform basis across the State; and (3) to ensure that sensitive information contained in disclosed internal affairs records is appropriately redacted in a consistent and timely manner." Id. at 1.

Section II of the directive is entitled, "Revisions to Internal Affairs Policies and Procedures relating to Supersession Authority." Id. at 10. The directive modified section 1.05 of the 1991 IAPP in relevant part by stating:

> [Whenever the Attorney General] determines that it would be appropriate to do so, the Attorney General, or his or her designee, may: (a) supersede a county prosecutor or other law enforcement agency in any investigation, criminal action or proceeding; (b) participate in any investigation, criminal action or proceeding; or (c) initiate any investigation, criminal action or proceeding. This statutory authority applies fully to any and all aspects of the internal affairs process, and nothing in the IAPP is intended to limit or circumscribe the Attorney General's statutory authority. The Attorney General may supersede and take control of an entire law enforcement agency, may supersede in a more limited capacity and take control of the internal affairs function of an agency, or may supersede and take control of a specific case or investigation. Whenever the Attorney General determines that supersession is appropriate, the Attorney General may assume any or all of the duties, responsibilities and authority normally reserved to the chief law enforcement executive and the agency. Every member of the agency, including the chief law enforcement executive, has a duty to cooperate fully with the Attorney General during the investigation and adjudication of such matters.
>
> [Id. at 10-11 (emphasis added).]

Directive No. 2022-14 represents the OAG's adoption of a regulation which contemplates unqualified supersession of law enforcement agencies besides county prosecutors. Since the passage of the directive, no act of the Legislature has expressly authorized the OAG's unilateral extension of its supersession powers beyond the scope of N.J.S.A. 52:17B-106 and -107, or N.J.S.A. 40A:14-181.

v.

L. 2023, c. 94

Some weeks after defendants' May 2023 supersession of the PPD, the Legislature passed L. 2023, c. 94 (Ch. 94). It states in pertinent part:

> The Attorney General, upon superseding a law enforcement agency in a city of the first class having a population of less than 200,000 according to the 2020 federal decennial census, may appoint a person who has not previously satisfied the applicable law enforcement officer training requirements established by the Police Training Commission . . . to serve as officer in charge of that law enforcement agency during the period of time during which the law enforcement agency is superseded. A person appointed pursuant to this section shall have previously served as a superior police officer and possess at least 10 years administrative and supervisory police experience.
>
> . . . .
>
> Nothing in this section shall be construed to limit the Attorney General's authority as chief law enforcement officer of the State.

This act shall take effect immediately, shall be retroactive to March 1, 2023, and shall expire upon the termination of the period of time during which the law enforcement agency in a city of the first class having a population of less than 200,000 according to the 2020 federal decennial census is superseded by the Attorney General.

[L. 2023, c. 94, §§ 1(a), (d); 2.]

We are guided by sound principles of statutory interpretation as we consider the language of Ch. 94.

> Our ultimate "task in statutory interpretation is to determine and effectuate the Legislature's intent." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009). Courts "look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." McGovern v. Rutgers, 211 N.J. 94, 108 (2012) (quoting Bosland, 197 N.J. at 553). "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citing Frugis v. Bracigliano, 177 N.J. 250, 282 (2003)). Thus, any analysis to determine legislative intent begins with the statute's plain language. Ibid. Our authority is bound by clearly defined statutory terms. Febbi v. Bd. of Review, 35 N.J. 601, 606 (1961). Where a specific definition is absent, "[w]e must presume that the Legislature intended the words it chose and the plain and ordinary meaning ascribed to those words." Paff v. Galloway Twp., 229 N.J. 340, 353 (2017) (citing DiProspero, 183 N.J. at 492).
>
> However, our review "is not limited to the words in a challenged provision." State v. Twiggs, 233 N.J. 513,

532 (2018). A court "'can also draw inferences based on the statute's overall structure and composition,' and may consider 'the entire legislative scheme of which [the statute] is a part.'" Ibid. (alteration in original) (citations omitted). "We do not view [statutory] words and phrases in isolation but rather in their proper context and in relationship to other parts of [the] statute, so that meaning can be given to the whole of [the] enactment." Id. at 533 (alterations in original) (quoting State v. Rangel, 213 N.J. 500, 509 (2013)).

Furthermore, "[t]he Legislature is presumed to be familiar with its own enactments, with judicial declarations relating to them, and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose." State v. Federanko, 26 N.J. 119, 129 (1958) (citing Appeal of N.Y. State Realty & Terminal Co., 21 N.J. 90 (1956)).

[Grillo v. State, 469 N.J. Super 267, 274-75 (App. Div. 2021).]

We begin by reviewing Ch. 94's plain language. It reveals no grant of express or implied supersession authority from the Legislature to defendants. Simply put, Ch. 94 authorizes the AG to appoint someone who has "previously served as a superior police officer and possess[es] at least 10 years administrative and supervisory police experience," but does not have the requisite police training certifications, to the position of OIC of the PPD. L. 2023, c. 94, § 1. The practical effect of Ch. 94 is to ensure that OIC Abbassi's

authority cannot be challenged due to an absence of New Jersey police training certifications.

Defendants argue that the presence of the words "superseding" and "superseded" in Ch. 94 must be interpreted to mean that the Legislature authorized their supersession of the PPD. We are unpersuaded. The terms "superseding" and "superseded," in the context of Ch. 94, establish the duration during which Abbassi may serve as OIC without the requisite certifications. There is no language in Ch. 94 which suggests that the Legislature intended to adopt Directive No. 2022-14.

In light of the plainly stated purpose of Ch. 94, the presence of the terms "superseding" and "superseded" create ambiguity about whether the statute also authorizes an expansion of the AG's supersession powers. To resolve this ambiguity, we look to evidence of the Legislature's intent. Sanjuan v. Sch. Dist. of W. N.Y., 256 N.J. 369, 379 (2024) (quoting DiProspero, 183 N.J. at 492-93) (explaining that if "ambiguity in the statutory language . . . leads to more than one plausible interpretation, we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'").

The record shows both the Senate and the Assembly conducted committee hearings on the bill which became Ch. 94.[13] In each hearing, an OAG representative testified in support of the bill and fielded questions from committee members.[14] The hearing transcripts confirm that the legislation's sole purpose, as described by defendants' representative, was to ensure that OIC Abbassi's time running the PPD was not consumed by New Jersey police training requirements. No witness or legislator broached the topic of defendants' legislative authority to directly supersede the PPD.[15] There is simply no legislative history to support the notion that the Legislature intended Ch. 94 to authorize an expansion of defendants' supersession powers. This leaves speculation as the foundation for any argument to the contrary.

---

[13] Hearing Before the S. L. & Pub. Safety Comm., at 0:18:20 to 0:22:11 (June 12, 2023), www.njleg.state.nj.us/archived-media/2022/SLP-meeting-list/media-player?committee=SLP&agendaDate=2023-06-12-11:00:00&agendaType=M&av=A; Hearing Before the Assemb. Judiciary Comm., at 3:19:50 to 3:31:00 (June 15, 2023), www.njleg.state.nj.us/archived-media/2022/AJU-meeting-list/media-player?committee=AJU&agendaDate=2023-06-15-10:00:00&agendaType=M&av=A.

[14] Stephan Finkel, Director of Legislative Affairs, Office of the Attorney General.

[15] The record also shows no witness or legislator inquired about the legality of section 1.05 of the 1991 IAPP as modified by Directive 2022-14.

A-0629-23

Ch. 94's narrow and specific legislation is vastly different from the comprehensive and granular grant of supersession authority enacted in the 1970 CJA, or even the implied grant of supersession authority derived from the Legislature's internal affairs mandate of 1996. If the Legislature had chosen to grant any supersession authority in Ch. 94, it had the means and opportunity to do so. It did not.

Because "[t]he Legislature is presumed to be familiar with its own enactments, with judicial declarations relating to them, and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose," we conclude the Legislature did not intend to authorize a supersession of the daily operations of the PPD when it passed Ch. 94. Liberty Ins. Corp. v. Techdan, LLC, 253 N.J. 87, 104 (2023), as revised (Mar. 23, 2023) (quoting Federanko, 26 N.J. at 129).

vi.

The Existence of an Implied Authority to Supersede

Defendants cite various cases for the uncontested proposition that county prosecutors have the supervisory authority to supersede the day-to-day operations of municipal police departments. Williams, 442 N.J. Super. at 599 n.2; Passaic Cnty. PBA Local 197 v. Off. of the Passaic Cnty. Pros., 385 N.J. Super. 11, 16 (App. Div. 2006); Gerofsky v. Passaic Cnty. Soc. for Prevention

32

of Cruelty to Animals, 376 N.J. Super. 405, 417 (App. Div. 2005). Defendants build on that proposition to make their ultimate point: as the state's "chief law enforcement officer," the AG has the same authority over municipal police departments that county prosecutors do. Defendants contend this includes direct and complete supersession over municipal law enforcement, without the consent of the municipality. Constantine, 406 N.J. Super. at 327; Yurick, 184 N.J. at 79; Ward, 303 N.J. Super. at 52-58; Winne, 12 N.J. at 168-69.[16]

We consider whether defendants can derive an implied authority to directly supersede a municipal police department from our jurisprudence.

The AG retains a "general supervisory" authority over county and municipal law enforcement. Constantine, 406 N.J. Super. at 327–28 ("Moreover, the [AG's] general supervisory powers extend directly to municipal law enforcement."); see also Kershenblatt, 264 N.J. Super. at 437 (internal citations omitted) ("The [AG] acts as the chief law enforcement

_____

[16] In the March 27, 2023 letter to Mayor Sayegh announcing supersession, the AG cited various cases which, he contended, stood for the proposition that it is "the Attorney General's role in overseeing law enforcement agencies as the chief law enforcement officer in the State and the County Prosecutor as the chief law enforcement officer in the county." See, e.g., State v. Winne, 12 N.J. 152 (1953); Williams v. Borough of Clayton, 442 N.J. Super. 583 (App. Div. 2015); Constantine v. Twp. of Bass River, 406 N.J. Super. 305, 327 (App. Div. 2009); State v. Ward, 303 N.J. Super. 47, 52-58 (App. Div. 1997); State v. Downie, 229 N.J. Super. 207, 209 n.1 (App. Div. 1988), aff'd, 117 N.J. 450, certif. denied, 498 U.S. 819 (1990); Kershenblatt v. Kozmor, 264 N.J. Super. 432, 435-38 (Law Div. 1993)" (citations reformatted).

33                                                                              A-0629-23

officer of the State. The county prosecutor, under the supervision of the [AG], is the chief law enforcement officer of the county."); Ward, 303 N.J. Super. at 54 ("Under N.J.S.A. 2A:158-5, since the county prosecutor has the same powers as the [AG], the county prosecutor also has general supervisory power over municipal prosecutors.").

However, these cases clearly distinguish the AG's supervisory authority from their supersession authority. Constantine, 406 N.J. Super. at 327–28 (citing to N.J.S.A. 52:17B-112(c) in referencing the AG's supervisory authority over municipal law enforcement); Kershenblatt, 264 N.J. Super. at 437 (listing the AG's "general supervision" authority over county prosecutors (N.J.S.A. 52:17B-103) separately from their supersession authority over county prosecutors (N.J.S.A. 52:17B-106)); Ward, 303 N.J. Super. at 54 (referencing N.J.S.A. 52:17B-103 and N.J.S.A. 2B:12-27 in relation to "general supervisory power" of the AG and county prosecutors).

Defendants cite to Williams v. Borough of Clayton[17] for the proposition that the terms "supervisory" and "supersession" are, for practical purposes, interchangeable. We are not persuaded.

---

[17] 442 N.J. Super. 583 (App. Div. 2015).

A-0629-23

In Williams, we defined supersession as "a period of time where the office of a county prosecutor directly supervises the day-to-day operations of a local police department within that county." 442 N.J. Super. at 587 n.2. In that case, the Gloucester County Prosecutor's Office (GCPO) took over the Borough of Clayton's police department after their chief of police took a leave of absence. Id. at 587. The GCPO's takeover was not contested by the municipality. Ibid.

Passaic County PBA Local 197 v. Office of the Passaic County Prosecutor[18] stands for the proposition that county prosecutors have "supervisory authority"[19] over county and municipal police officers. In that case, the Passaic County Prosecutor's Office (PCPO) ordered Passaic County sheriff's officers and Wayne Township police officers to provide urine samples for drug testing. Passaic Cnty. PBA Local 197, 385 N.J. Super. at 13. Law enforcement unions, not the county or the municipality, filed suit challenging

---

[18] 385 N.J. Super. 11, 16–17 (App. Div. 2006).

[19] The term "supervisory authority" in the context of county prosecutors originates from our decision in Gerofsky, 376 N.J. Super. at 417 (finding that county prosecutors have "broad supervisory authority over the operations of municipal police departments"). In Gerofsky we referenced our decision in Cherrits v. Vill. of Ridgewood, 311 N.J. Super. 517, 530–31 (App. Div. 1998). In Cherrits, we held that a county prosecutors' authority to craft law enforcement policies and procedures was superior to municipal authority. Id. at 531 (citing Winne, 12 N.J. at 163).

A-0629-23

the PCPO's authority to initiate reasonable suspicion drug tests pursuant to the AG's Law Enforcement Drug Testing Policy.  Id. at 15.  In a limited holding, we stated that county prosecutors could:

> initiate and issue drug testing orders to law enforcement officers within the county, based upon reasonable suspicion under the Attorney General's Law Enforcement Drug Testing Policy, either when one of the unusual conditions referred to by the motion judge exists, or when, as here, the chief law enforcement officer in the affected jurisdiction consents to the County Prosecutor initiating the order.
>
> [Id. at 19 (emphasis in original).]

We noted that "it should be the unusual case where the Prosecutor initiates drug testing orders without the prior consent of the local police chief or county sheriff, or other extenuating circumstances."  Id. at 20 (emphasis added).

Two features distinguish the matter before us from Williams and Passaic County PBA Local 197.  First, the AG directly superseded the municipal police department, rather than exercising its powers through the county prosecutor, where the powers of supersession are statutory.[20]  Second, both

---

[20] We express no opinion on whether the AG's nonconsensual supersession of an entire municipal police department by directing and working through the county prosecutor's office would be authorized by any existing legislation. That question is not before us.

A-0629-23

Williams and Passaic County PBA Local 197 involve supersessions where local government consented to the county prosecutor's takeover. We conclude both cases are inapposite.

We also address State v. Winne.[21] In Winne, our Supreme Court held that county prosecutors are statutorily "responsible for seeing that [the detection, arrest, indictment and conviction of offenders against the law] are done either by himself or his staff or by the local law enforcement authorities functioning within his county." Id. at 168 (citing N.J. Rev. Stat. § 2:182-5 (1937) (recodified at N.J.S.A. 2A:158-5)). The Court acknowledged a county prosecutor's power over local law enforcement authorities to fulfill these "official duties." Id. at 168-69 ("It is a matter of common knowledge that the local law enforcement authorities . . . are responsive to the county prosecutor's concept of law enforcement on pain of possible indictment if they do not cooperate with him in enforcing the law . . . . He is in a position to command the cooperation of all the law enforcing authorities in the county."). The Court concluded that an indictment of common law nonfeasance against a local county prosecutor was not flawed because it clearly set forth the prosecutor's breach of their official duty under N.J.S.A. 2A:158-5. Id. at 170.

---

[21] 12 N.J. 152 (1953).

The facts of this case are distinguishable from <u>Winne</u>. The set of questions before us involve the extent of the supersession authority vested directly in the AG, not county prosecutors. <u>Winne</u> does not stand for the proposition that county prosecutors have the implied authority to supersede municipal police departments, and our holding that the AG does not have the legislative authority to supersede municipal police departments without their consent poses no conflict.

IV.

Because we conclude defendants had no authority, either express or implied, to directly supersede the entire PPD, we now identify the consequences which flow from our conclusion.

We reverse the AG's final administrative decision of March 27, 2023 superseding the PPD. We direct defendants to: reassign Chief Ribeiro to Paterson from the Police Training Commission; relinquish control of the PPD to city officials authorized by law to administer its daily operations, including Director Bulur and Chief Ribeiro; and produce a narrative written report to plaintiffs summarizing all actions and accounting for all expenditures undertaken by defendants on behalf of the police department from March 27, 2023 to the date of this opinion. These actions, including completion and

38

issuance of the report, shall be completed within twenty-one days of the date of this opinion.

We note plaintiffs have consented to the 2021 supersession of the Paterson Internal Affairs Unit by defendants and the PCPO, and they have declined to challenge it in the appeal before us. That joint internal affairs supersession by the AG and the PCPO remains undisturbed.

Because we conclude defendants exceeded their statutory authority, we need not reach plaintiffs' claims that defendants violated plaintiffs' rights under the New Jersey Constitution, the Home Rule Act, and various other statutes.

We stay this matter for three business days from the entry of this decision by the clerk to permit any party to seek emergent relief from the Supreme Court. Should any party file such an emergent application with the Court, the stay shall continue until the Court disposes of the application, or until further order of the Court.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0629-23